Filed 7/11/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S097886 |
| v. | ) | |
| | ) | |
| LOUIS RANGEL ZARAGOZA, | ) | |
| | ) | San Joaquin County |
| Defendant and Appellant. | ) | Super. Ct. No. SP076824A |
| _____ | ) | |

In February 2001, a San Joaquin County jury found defendant Louis Rangel Zaragoza guilty of the 1999 first degree murder of David Gaines and the robbery of William Gaines. (Pen. Code, §§ 187, 189.)[1] The jury found true the robbery-murder and lying-in-wait special circumstances — making defendant eligible for the death penalty (§ 190.2, subd. (a)(15), (17)(A)) — and also concluded that defendant personally used a handgun and caused a death in the commission of the murder and robbery. (Former §§ 12022.5, subd. (a), 12022.53, subd. (d).) Following the penalty phase trial, the jury returned a verdict of death. This appeal is automatic. (§ 1239, subd. (b).) We reverse the death judgment because of error in the death-qualification of the jury, but otherwise affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

I. FACTS

The judgment of death under review rests on the jury's finding that defendant murdered David Gaines in the commission of a robbery and while lying in wait. The prosecution's theory was that defendant and his brother, David Zaragoza, together committed the robbery murder and that defendant was the shooter. The brothers were originally charged in a single information. After David Zaragoza was found incompetent to stand trial, defendant was tried alone.

A. Guilt Phase

*1. The Prosecution's Case*

The murder victim was 36-year-old David Gaines. He worked with his father, William Gaines, 87, at Gaines Liquors in Stockton. On Friday, June 11, 1999, David Gaines arrived for work in the afternoon, as usual. William Gaines returned to the store around 7:00 p.m., bringing food his wife Mary had prepared. Mary usually packed a meal and salad for her son on Friday nights because there was no time for him to go out for a sandwich. The salad was in a fluted Pyrex glass bowl with a blue lid.

After closing the store at 11:00 p.m., David and William Gaines drove in separate cars back to their home, located at 1122 Cameron Way, in an unincorporated area of Stockton. David Gaines parked his car in the garage; William parked his in front of the house. When William Gaines got out of the car, he was holding a brown paper bag in one hand and his keys in the other. On rare occasions, William Gaines would bring home the day's receipts, but the paper bag on this day contained only the Pyrex bowl. As soon as William Gaines shut the car door, a man punched him in the chin and shoulder. With his other hand, the man grabbed the bag containing the Pyrex bowl. William Gaines briefly fell to one knee. When he got back up, he called out "David" to his son. The assailant,

2

later identified by William Gaines as David Zaragoza, took off running in an eastbound direction.

David Gaines rushed outside with a canister of Mace and said, "Hey." David Zaragoza was already 10 to 30 feet down the street, with his back to William Gaines. Suddenly, William Gaines heard gunshots, so he ducked behind his vehicle. He did not see any muzzle flash coming from the fleeing David Zaragoza before he lost sight of his assailant. Seconds later, when the gunfire had ceased, William found his son on the driveway in a pool of blood. David Zaragoza and another man were running down the street. The men were 50 to 100 feet away, one trailing about 10 feet behind the other. William Gaines entered the house to tell his wife what had happened and to call 911. The 911 call came in at 11:16 p.m.

Carol Maurer, who lived across the street and a little to the east of the Gaines residence, testified that she looked outside her bedroom, the room closest to the Gaines residence, after hearing gunfire. She saw two young men, medium build and "not too tall," heading east. The men were running fast and only a few feet apart. The one in back was wearing white. Maurer had told neighbor David French at the scene that she saw two young people running down the street after the shots were fired, and French in turn relayed that information to 911. Cindy Grafius, who lived east of the Gaines family home on Cameron Way, heard four loud "pops" and then saw a person run by her driveway. She did not recall seeing anything in this person's hands. By the time she walked outside her home, she looked west and then east but did not see anyone.

David Gaines was not breathing and had no pulse when the paramedics arrived. He suffered four gunshot wounds: one each to his head and wrist, and two to his chest. The presence of soot indicated that these must have been contact wounds, except for the wound to the head, where the muzzle would have been no

3

more than 18 inches away. The three bullets that could be recovered were so damaged as to preclude the conclusion that they were fired by any particular gun, but the criminalist was able to determine that they all could have been fired by the same gun.

The prosecution theorized that the first shot, a defensive wound, hit David Gaines's wrist and caused his watch to shatter and spread pieces over a large area. The remaining shots, which were fatal, spun David Gaines around. Based on the trajectory of the bullets, the northwesterly direction of the blood spatter, and the recovery of a spent bullet in the next-door neighbor's yard to the east, the prosecution argued that David Gaines must have been facing south, away from the fleeing David Zaragoza but toward his killer, at the time he was shot. According to the prosecution, this was the only explanation for the downward trajectory of the bullets that entered David Gaines, who was taller than defendant or his brother and was on a driveway that sloped up from the street toward the house.

Later that night, William Gaines scooped up some papers from the ground near his car door. He assumed they must have fallen out of his shirt pocket when he was accosted. The next morning, after looking at the papers, he realized they were not his and called the San Joaquin County Sheriff's Department. The papers included a number of items that bore David Zaragoza's name or fingerprints, including a Medi-Cal identification card, a transit card, and a San Joaquin County Medical Facility interoffice memo.

Meanwhile, at the crime scene, the sheriff's department had already recovered a torn book-and-release form and another piece of paper with the words "Mr. Zar" on it. Further research revealed that the form belonged to David Zaragoza. The next morning, June 12, 1999, Detective Jerry Alejandre went to the board and care home where David Zaragoza resided; David was not home. Alejandre interviewed the caretakers and was shown photographs of David

4

Zaragoza and his family, including a single photo of defendant. When Detective Alejandre returned to the board and care home in the afternoon, the photo of defendant was missing from the display.

In his statement to police on June 12, 1999, David Zaragoza denied being with defendant on the previous evening. A clinical psychologist who examined David in January 2000 diagnosed him as suffering from chronic paranoid schizophrenia, polysubstance abuse (in remission because of his incarceration), and severe personality disorder with paranoid, antisocial, and schizotypal features. David had borderline intellectual functioning, a verbal IQ of 61, a second grade reading level, and a global assessment of functioning score indicating severe impairment and psychosis.

On June 13, 1999, Detective Bruce Wuest went to 429 South Airport Way, where defendant lived with his sister, Nina Koker, and her disabled husband, John Koker, to search for evidence. In the garbage bin outside the Koker residence, Wuest found a fluted Pyrex glass bowl, which had been wrapped in a plastic bag from Grocery Outlet and placed in a white kitchen-size garbage bag. There was oil inside the bowl, which was consistent with its having contained a salad. Mary Gaines identified the bowl as the one she had used to pack dinner for her son on the day he died. Wuest also found a small white bag containing a receipt from a Jack in the Box on Pacific Avenue, which was less than a mile from the Gaines residence, and an empty pack of Marlboro 100 Lights. The Jack in the Box receipt was dated June 12, 1999, at 12:03 a.m. The garbage bin was otherwise empty, as the garbage had been picked up on Friday, June 11.

Two days later, Wuest returned to the Koker residence and looked in the garbage bin again. This time, he found the blue lid to the fluted Pyrex bowl. The lid had been placed in a coffee can that was used for cigarette butts. Wuest

recalled seeing the coffee can inside the house during his earlier visit.  Mary Gaines identified the lid as hers.

No Pyrex products were found inside the Koker residence.  Yolanda Tahod, defendant's mother, confirmed that neither she nor her daughter owned any Pyrex bowls of the type found in the garbage at the Koker residence.  Koker claimed that she sometimes would put plastic containers of dog food in the refrigerator, forget about them, and then throw them away when she was cleaning up.  She did not know whether she had thrown any bowls away between that Friday, when the garbage was picked up, and that Sunday, when the police found the Pyrex bowl in the garbage can.  Nor did she know how the blue lid to the Pyrex bowl came to be in the coffee can.

On Sunday, June 13, 1999, defendant voluntarily went to the sheriff's department for a videotaped interview.  The jury viewed excerpts from that interview, as well as excerpts from defendant's interview the next day following his arrest.  During the first interview, defendant admitted that he had been with his brother on Friday night, but denied any involvement in the robbery or murder.  According to defendant, David Zaragoza had called on Friday to ask whether he could spend the night at the Koker residence.  Defendant secured permission from his sister and called his brother back to tell him that he would be picked up after their mother dropped off the car.  (Koker, however, testified that she had *not* given permission for David to sleep over that night.)  Defendant picked up David around 9:30 p.m. in front of the board and care home.  David, who (according to defendant) often dresses "weird," was wearing a white tuxedo vest and gray or

6

blue pajama-style pants from the Stockton State Hospital.[2]  Defendant complained that his hands were numb and tingling from his work as a welder, and asked David to rub some ointment on his hands and feet.  After David did so, defendant fell asleep.  When defendant woke up between 11:00 p.m. and 11:30 p.m., David was gone.  Defendant estimated that he must have fallen asleep between 10:00 p.m. and 10:30 p.m.  David called the next morning to explain that he had decided to leave the previous night because he was hearing voices.  Defendant said he left for work on Saturday morning around 4:45 a.m., but was told when he arrived that there was no work for him.

After defendant was arrested and reinterviewed on June 14, 1999, he told police that David Zaragoza wanted to spend Friday night at the Koker residence, that defendant picked David up and brought him to the house between 9:45 p.m. and 10:00 p.m., that David was wearing a white vest and tennis shoes, that defendant asked David to massage a sports cream into his aching feet, that defendant fell asleep around 10:30 p.m., and that defendant woke up around 11:30 p.m. or 11:45 p.m. to find that David was gone.  The following afternoon, David called defendant to explain that he had left because he was hearing voices and could not get any medication until Monday.  When defendant asked David about his two visits with the police, David said, "I got nothing to worry about, because I ain't did nothing."  Defendant admitted that he was the person who empties the trash at the Koker residence, but said he had no knowledge about the bowl that was found in the garbage can outside the house.  He did point out, though, that his

---

[2]     David Zaragoza was wearing those pants when he was interviewed on June 12, 1999, and likewise told police he had been wearing those same pants, which had no pockets, the night before.

sister "throws a lot of bowls away." He also denied going to Jack in the Box that night. He added that his sister eats a "lot" of fast food.

Defendant and his mother, Yolanda Tahod, told police that David Zaragoza did not drive and that they had never known him to drive. Stella Lee Tahod, defendant's sister-in-law, believed that she had seen David drive in 1985 or 1986; David, however, had been in prison for all but four months in 1985 and all but two months in 1986. Eddie Tahod, defendant's half brother, recalled that David had driven as a teenager, 20 to 25 years earlier. Yolanda Tahod testified at trial that David had driven a car before, but not since 1975. Yolanda Tahod also testified that she regularly let defendant use her car, a beige Honda, to drive back and forth to work and that she returned the car to defendant around 7:00 p.m. on the night of the murder.

Billy Gaines, grandson of William Gaines and nephew of David Gaines, testified that defendant came into the liquor store in the early afternoon on the day before the murders to buy a beer. Defendant pointed to a "funny" ball behind the counter and asked what it was. Billy Gaines told defendant it was a camera. Defendant asked whether it worked and, before leaving, said "Cool, pretty neat." Defendant's timesheet, however, showed that he was at work in Tracy until 4:32 p.m. that day.

Paul Banning, who worked evening shifts at the liquor store, testified that he had seen defendant there on occasion. He, like Billy Gaines, did not remember ever seeing David Zaragoza.

Howard Stokes, who lived down the street from the Gaines family, testified that William Gaines came home from closing the store each night at the same time. On Monday, June 7, 1999, four days before the murder, Stokes was walking his dog when he saw a male, possibly Latino, with a stocky build, between five feet six inches and five feet eight inches tall, get out of a green minivan and walk

towards the Gaines residence. When William Gaines drove up to the house, however, the man hid behind a tree. As Stokes and the man walked on opposite sides of Cameron Way in the same direction, Stokes saw what appeared to be some sort of coating on the man's face, which gave the man a "scary" look. Stokes was not sure whether the man had facial hair. (Defendant had a very full mustache at the time.)

Stanley Monckton, who lived on Cameron Way near the Gaines family, testified that he was watering his lawn around noon on Saturday, June 12, 1999, the day after the murder, and saw defendant driving a car — an older white or cream Honda, like the car defendant typically drove — that seemed to be out of place in the neighborhood. Defendant drove by slowly.

In an effort to challenge defendant's claim that his sister, Nina Koker, must have visited Jack in the Box just after midnight on Saturday, June 12, 1999, the prosecution offered evidence that Koker and the man who became her fiancé, Raymond Padilla, visited Padilla's cousin, Marcus Anthony Ellsworth II, on June 11 for dinner at his home. Ellsworth testified that Koker realized at the end of the night that she had locked her keys in her car and had to call a locksmith, who took 30 to 45 minutes to arrive. Ellsworth estimated that Koker left between 1:00 a.m. and 2:00 a.m.

Koker, on the other hand, denied having anything to eat that night until she stopped at the Jack in the Box on her way home. Koker agreed that she and Padilla had gone to Ellsworth's house that evening for a barbecue, but claimed that there was no food because Ellsworth's parents had gone to Reno for their daughter's graduation. Koker said the three of them watched television all evening instead. She did not realize she had locked her keys in the car until it was time to leave. She was able to retrieve her keys 10 or 15 minutes before midnight,

9

went to Jack in the Box, and got home around 12:25 a.m. Koker said she got up for work less than three hours later.

Padilla could not recall whether they ate anything at Ellsworth's home. He said Koker left around midnight, between five and 20 minutes after the locksmith retrieved her keys from the locked car.

The bookkeeper at Cecil's Security Systems testified that Koker's request for assistance with a locked car was received at 11:51 p.m., that a locksmith arrived at 11:59 p.m., and that the work was completed at 12:08 a.m. — five minutes after the time stamped on the Jack in the Box receipt. The Jack in the Box on Pacific Avenue was about a quarter-mile from Ellsworth's house.

### 2. *The Defense Case*

Detective Alejandre testified that William Gaines did not claim when interviewed at the scene to have observed two people running away after shots were fired. In fact, Gaines told Alejandre that he did not see anyone other than the man who assaulted him.

When Deputy Sheriff Daniel Anema spoke to Carol Maurer around 12:30 a.m. on June 12, 1999, Maurer was very shaken up and did not give her name. Anema found it difficult to get information out of her. Maurer said she heard four shots and then saw two White males running down the street. A defense investigator, Wilson Stewart, talked with Maurer in May 2000. Maurer told Stewart that she heard the shots and then saw two "Mexican boys" fleeing. Stewart also talked with Howard Stokes, who said that David Zaragoza's

10

photograph was "consistent" with the person he had seen on June 7, 1999, who did not have a mustache like the one depicted in defendant's newspaper photograph.[3]

Antoinette Duque, defendant's former girlfriend, testified that defendant called her three times between 6:24 a.m. and 10:42 a.m. on Saturday, June 12, 1999. In the early morning of June 14, 1999, defendant called to say that he believed he was going to be arrested.

James Allen, a caretaker at the group home where David Zaragoza lived, testified that David was absent from the home during the evening of the murder but returned sometime during the 10 o'clock news. Allen stated that the weekend curfew at the group home was between 10:00 p.m. and 11:00 p.m. Ernie Williams, who was David's roommate at the group home, told Detective Wuest that David came home near the end of the *Late Night with David Letterman* show, which began at 11:00 p.m.

Kimberly Kjonaas, a senior psychiatric technician for the San Joaquin County Mental Health Department, testified that David Zaragoza came to the clinic in the morning of June 13, 1999. He claimed that he was sick and needed to be admitted for treatment. Although David strained to defecate in his pants and then smeared feces on his shirt, Kjonaas did not have a basis to commit him at that time.

---

[3]     By the end of the case, the prosecution no longer insisted on the theory that Stokes had seen defendant — rather than his brother David, who was of similar height and build — on that Monday night. The prosecution focused instead on evidence establishing that defendant and his brother were together that evening: defendant had picked up David from Eddie Tahod's house before 9:00 p.m. on Monday; defendant stopped next at Gaines Liquor Store, which was two or three blocks away, to pick up cigarettes for his brother; and the two of them then went to the Back Door bar for about an hour.

11

David Zaragoza's mother testified that David had a temper and that what he said sometimes did not make any sense.

The defense commissioned an animated recreation depicting its version of the events surrounding the murder and showed it to the jury. The depiction assumed that David Zaragoza knew how to drive, that David Zaragoza took the car from the Koker residence without permission, that he returned to the group home between 10:00 p.m. and 10:30 p.m., that he drove from there to the Gaines residence, that a number of identifying papers spilled out of his pocket when he pulled out a gun and shot David Gaines, that he placed the bag containing the Pyrex bowl into the garbage can at the Koker residence around 11:30 p.m., and that he left the car there and walked back to the group home, which was over two miles away. The animation did not explain how the bag containing the bowl was placed in a Grocery Outlet bag or how the lid got into the Koker residence. The information underlying the animation came from defense counsel, not from transcripts of the trial or statements made by defendant.

Nina Koker told police that she smoked Marlboro Lights, which was the brand of the empty pack that police found in the Jack in the Box bag. When defendant was interviewed by police on June 14, 1999, he was smoking Camel cigarettes.

### 3. Rebuttal

Psychiatrist Kent Edward Rogerson, who evaluated David Zaragoza in 2000 and found him incompetent to stand trial, testified that David was intellectually disabled, had reduced activity in the parts of the brain associated with executive functioning, and was very easily led. Rogerson opined that David's illness was "variable" and that he was capable of goal-directed behavior as well as great violence.

12

B.  Penalty Phase

*1.  Prosecution Evidence*

The prosecution presented evidence of defendant's prior crimes as well as testimony from David Gaines's family about David's life and the effect of his murder.

On September 21, 1975, defendant, then 15, and Daryl Thomas, 19, planned to rob a liquor store in Stockton.  Upon arriving at the store, defendant recognized the clerk and decided not to commit the robbery.  After a bite to eat, defendant and Thomas robbed a cab driver, Benny Wooliver.  Thomas shot the driver behind the right ear and killed him.  They took $50 and fled from the cab, which had jumped the curb and hit a tree and a house.

Defendant and Thomas were picked up in a van driven by their friend Gilbert Renteria, who was with three male occupants.  This larger group decided to rob a 7-Eleven store in north Stockton.  One of the van occupants, Marcus Duron, took the money from the cash register.  Before leaving the store, defendant fired twice, hitting the store clerk, Dale Sym, once in the small of his back.  The other bullet passed through Sym's shirt and hit a slushie machine.  Renteria and Duron got back to the van first and drove off at high speed.  Police stopped the van shortly thereafter and arrested the occupants.  Defendant, who had been left behind, stole a bicycle and rode home.  The van's occupants implicated him in the robbery, and he surrendered to police three days later.

Defendant admitted to first degree murder as an aider and abettor, was committed to the California Youth Authority, and was released five years later.  During Thomas's trial for Wooliver's murder, defendant testified that he had shot the victim and that Thomas was not even in the cab at the time.  Thomas was nonetheless convicted of first degree murder.

13

On December 24, 1980, defendant was stopped while driving and was found in possession of stolen property. In addition, a .22-caliber pistol was found underneath the car's right rear seat, and a shortened rifle with a "banana clip" was found in the trunk. He was sentenced to prison.

On July 6, 1982, the FBI and the Stockton Police Department, based on a tip, were able to thwart the robbery of a Bank of America branch in Stockton. One of defendant's accomplices, who discharged his weapon immediately upon entering the bank, was shot by an FBI agent. This accomplice managed to shoot and wound another FBI agent before dying. Another accomplice was shot and wounded trying to run from the scene. Defendant initially pointed his sawed-off shotgun at an FBI agent when ordered to drop his weapon, but complied with the order when an agent on top of the building fired a warning shot. Subsequent inspection of defendant's shotgun revealed that it had malfunctioned. Defendant was sentenced to federal prison for his part in the attempted bank robbery and was released in October 1998.

David Gaines was described as an innocent and gentle son, brother, and uncle, who enjoyed gadgetry, flying airplanes, history, and his family. David lived with his parents, who were both over 80 years old, and was the son who helped out the most at the liquor store. David's parents were convinced they would not have another good day for the rest of their lives.

2. *Defense Evidence*

Defendant testified at his penalty trial. He started skipping school in junior high, "took off" from juvenile hall but turned himself in, and then was sent to the California Youth Authority when he was 12 or 13. After he was released from the Youth Authority in 1975, he lived on the streets and met Daryl Thomas. He and Thomas committed four or five strong-arm robberies of people on the street. He

14

admitted his involvement in planning to rob a liquor store, robbing a cab driver, robbing a 7-Eleven, and shooting the 7-Eleven clerk. Defendant said he agreed to testify at Thomas's trial because Thomas was facing a sentence of life in prison and defendant felt sorry for Thomas, who was the father of a newborn baby. Defendant also admitted burglarizing some homes just before he was pulled over and arrested for receiving stolen property in 1980.

When defendant was released from state prison, he joined a crew of friends and committed five bank robberies in a 30-day period. Defendant said that he was armed with a sawed-off shotgun during the attempted robbery at the Bank of America, but that he had broken the firing pin to render it inoperable prior to the robbery. Over the course of his 16 years in federal prison, defendant came to realize that he wanted the family life that his brothers and sisters had.

When defendant was released from federal prison in October 1998, he completed Delta College courses in machinery and welding and got a job as a welder in April 1999, after passing a welding test, a physical exam, and a drug test. This was his first regular job, and it made him feel proud. He worked six days a week, spent Sundays with Duque, who was at first his girlfriend and then just a friend when his desire to start a family could not be reconciled with her lack of interest in having more children. He also went to church regularly.

Defendant admitted driving David Zaragoza home from Eddie Tahod's house on the Monday prior to the murder and testified that they stopped at Gaines Liquors before dropping David at the board and care home. But he denied going to the Back Door bar that evening, although he conceded that he and David had gone there some other evening. Defendant's description of his actions on the night of the murder and his conversation with his brother David the next day largely tracked the version he had given in his police statements.

15

Defendant's mother, Yolanda Tahod, testified that defendant's father, Louis Zaragoza, Sr., often beat her and that the family was on welfare much of the time because her husband could not keep a job. Louis, Sr., often drank and physically and verbally abused the children, particularly David and defendant. In 1967, Yolanda Tahod separated from Louis, Sr., after he was hospitalized for digging a grave big enough for the whole family in their backyard, and left Los Angeles. Defendant was seven years old. She moved the children to Stockton and married Albert Tahod a year later. Shortly thereafter, Louis, Sr., kidnapped the children, but was arrested on the freeway. Yolanda and Albert drank a lot, and Yolanda started to neglect her children.

Defendant's troubles with the law coincided with the family's move to Stockton. He began shoplifting at seven, was arrested for shoplifting and malicious mischief at 11, and was arrested for shoplifting, vehicular burglary, and glue-sniffing at 12. He was made a ward of the juvenile court. The family believed that Ruben Arellano, Sr., a counselor at the Youth Authority and old enough to be defendant's father, had a negative influence on defendant. Defendant was driving Arellano's car at the time he was arrested for receiving stolen property, and it was Arellano who connected defendant, once he was released from prison, with a woman who organized bank robberies.

Yolanda and other family members testified that defendant decided to change his life upon his release from prison in 1998: he reestablished his relationship with her, his siblings, and their children with the help of religion; attended college welding classes and got a job he enjoyed; had a girlfriend and wanted to start a family; and made arrangements to borrow money from his half brother Eddie to purchase a car. David, on the other hand, was known for his bursts of anger and his delusions of persecution.

16

When David Zaragoza called his mother on the night of the murder, he told her that defendant had fallen asleep while he was massaging defendant's feet and that he was going to walk home. A week after David was arrested, he admitted taking her car to commit the robbery and killing David Gaines. He said he needed money to buy rock cocaine.

On June 21, 1999, David Zaragoza told his brother Reynaldo that he left the house after defendant fell asleep and met up with an unknown White man who offered him a ride. While in the vehicle, he saw a revolver. The White man, who had long blond hair, a thin build, and raggedy clothing, drove to somewhere in north Stockton and shot someone at a residence before taking David home.

During defendant's trial, David told family members visiting him at Napa State Hospital that he had committed the shooting himself. David recounted to them that he had needed drugs, and a White male he did not know had handed him a gun. David then drove off in his mother's car. After the shooting, he sold the gun for drugs, drove back to Nina's house, left the car there, and walked home. David also stated four times during a pretrial hearing that he had shot and killed David Gaines and added that he wanted to be sentenced that day. Later in the hearing, David pulled down his pants and defecated in the courtroom.

A crisis clinician at the San Joaquin County Mental Health Services considered David a danger to others, based on an assessment he had conducted in February 1999, and testified that David had stopped taking his medications at that time, was abusing drugs, and indicated he might kill himself or others.

Defendant attended Bible study and religious services in jail while awaiting trial in this case. Defendant recruited other inmates to participate and hold Bible study on days when the prison ministry was not present. A number of fellow inmates testified that they gained salvation and the determination to improve their lives as a result of defendant's ministry.

17

*3. Rebuttal*

Yolanda Tahod spoke with a district attorney investigator on August 3, 1999. According to Yolanda, David Zaragoza told her he had been walking to a donut shop on Charter Way to buy a soda when he approached a White man in a car. The White man offered to give him some change if David went with him. The White man then drove to a residence in north Stockton and shot somebody. Later in the conversation, David told his mother that he killed a man. As he was on medication, he did not remember everything about it, but did know that he didn't mean to do it.

Stella Tahod, defendant's sister-in-law, told an investigator working for David Zaragoza that David had called her from the county jail on August 12, 1999, to say, "I'm getting 250 milligrams of Haldol. Then they wonder why we shot that man." Stella, however, denied telling the investigator that David had said "we." During a jail visit that same day, David told Eddie Tahod, Stella's husband and defendant's half brother, that he left the house after defendant had fallen asleep, that he was picked up by a White man in a car, that the White man flashed a gun, and that he then dozed off. David did not mention anything about a shooting.

During a police interview on June 12, 1999, David said he had not been with defendant at all the night before. David said instead that he had walked to a Taco Bell from the board and care home, did not mention meeting any White man, and denied any involvement in the murder. Yolanda initially denied to police that David had contacted her on the night of the murder, but admitted on June 21, 1999, that such a call occurred. She could not remember what David had said.

18

II. Jury Selection Issues

A. Asserted Error in Excusing Jurors for Cause

Defendant contends that the trial court erred by dismissing two prospective jurors based solely on responses in their written questionnaires concerning the death penalty. We conclude that the dismissal of one juror was error, requiring reversal of the penalty judgment.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to an impartial jury that has not been tilted in favor of capital punishment by prosecutorial challenges for cause. (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) To protect that right, a challenge for cause because of a prospective juror's views on the death penalty may properly be sustained only when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) Thus, a death sentence cannot stand if the jury that imposed or recommended the penalty was selected by excluding prospective jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 522.) Even those who "firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176.)

When the trial court's assessment of a prospective juror's capacity to serve is based at least in part on the juror's tone, demeanor, or other elements that cannot be reflected in the written record, its ruling is owed deference by reviewing courts. (*People v. Avila* (2006) 38 Cal.4th 491, 529.) But no such deference is

19

warranted when a trial court's ruling on a for-cause challenge is based solely on the prospective jurors' answers to a written questionnaire. (*Ibid.*) In those circumstances, we review de novo the trial court's dismissal of the prospective juror for cause. (*People v. Riccardi* (2012) 54 Cal.4th 758, 779.)

### 1. *Prospective Juror No. 129*

Prospective Juror No. 129's questionnaire responses reflected the extent of her personal opposition to the death penalty. When asked whether she had any religious convictions that would in any way interfere with her ability to sit as a juror in a capital case, Juror No. 129 answered "Yes" and wrote "Don't feel I have the right to decide if a person is to die." A similar question 11 pages later asked whether she had any religious, moral, or personal beliefs that would make it difficult to impose the death penalty. She responded "Yes" and wrote "Don't believe I have the right to make judgement [*sic*] for another human being to die." The juror provided a very similar answer when asked for her "general feelings about the death penalty." When asked if there were "particular reasons" for her feelings on the issue, the juror responded "No[,] other than <u>moral</u>," and referred to her earlier responses. Near the end of the questionnaire, the juror answered "No" when asked whether her "answers given above" were "based on a religious consideration" but then said "Somewhat" when asked in question No. 19 whether she believed "that any religious beliefs [she] may have would have a substantial impact on [her] decision in this case."

What her responses to the same questionnaire also suggested, though, is that Juror No. 129 could nonetheless put aside her views about capital punishment in determining the appropriate penalty in this case. In the section entitled "Attitudes Regarding The Death Penalty," she stated without qualification that she would not refuse to find the defendant guilty of first degree murder just to prevent

20

the penalty phase from taking place, nor would she refuse to find a special circumstance allegation true just to prevent a penalty phase from taking place. She also conveyed that she would not automatically vote for life imprisonment without the possibility of parole "because of any views [she] may have concerning the death penalty," that she would not substitute a different standard of proof in a capital case, and that she would be able to follow the court's instructions not to consider the issue of penalty during the guilt phase and not to consider the relative costs of execution and life imprisonment in deciding the penalty. Moreover, when asked in question No. 9d, assuming she was in the penalty phase of the trial, "Could you set aside your own personal feelings regarding what the law in this case ought to be and follow the law as the court explains it to you?," the juror answered, "Yes."

When the prosecutor then challenged Juror No. 129 for cause based on her religious beliefs, defense counsel objected: "I don't believe she's presented an unwillingness to follow the law." The trial court initially expressed some uncertainty about the juror's responses, and the adequacy of some of the questions. With respect to question No. 19 in particular, which asked whether the juror believed her religious beliefs would have a substantial impact on her decision, the court admitted, "I don't think it was a very good question. We probably should have elaborated a little bit on this." Nonetheless — and based solely on the written responses in the questionnaire — the trial court excused the juror, citing only in a conclusory fashion "a substantial impairment to prevent her ability to be neutral" and to "follow the Court's instructions."

Reviewing that ruling independently, we conclude the trial court erred. The prosecution, as the party making the challenge, had the burden to establish the juror's impairment. (*People v. Stewart* (2004) 33 Cal.4th 425, 445 (*Stewart*).) In assessing whether the prosecution carried its burden, the question is not whether

21

the record might reasonably have supported a finding that the juror was unwilling to follow instructions pertaining to the death penalty. Rather, a prospective juror may be discharged for cause solely on the basis of written questionnaire responses only if it is "clear" from those responses that the juror is unable or unwilling to temporarily set aside the juror's beliefs and follow the law. (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 781, fn. 11; *People v. Avila*, *supra*, 38 Cal.4th at p. 531; see also *People v. McKinnon* (2011) 52 Cal.4th 610, 647-648.) Where a prospective juror's written responses are ambiguous with respect to the individual's willingness or ability to follow the court's instructions in a potential penalty phase, the record does not support a challenge for cause. (*Stewart*, at pp. 448-449.)

The for-cause challenge should not have been sustained on this record. A prospective juror's conscientious objection to capital punishment is not by itself a sufficient basis for excluding that person from jury service. (*Stewart*, *supra*, 33 Cal.4th at p. 446.) Although the juror here also stated that her beliefs would make it "difficult" to vote for execution, we have explained that "[b]ecause the California death penalty sentencing process contemplates that jurors will take into account their own values in determining whether aggravating factors outweigh mitigating factors such that the death penalty is warranted, the circumstance that a juror's conscientious opinions or beliefs concerning the death penalty would make it very difficult for the juror ever to impose the death penalty is not equivalent to a determination that such beliefs will 'substantially impair the performance of his [or her] duties as a juror' . . . ." (*Id*. at p. 447.) That is especially true here, where the juror affirmed that her personal views would not control her approach to various aspects of the case and that she could set aside her personal feelings and follow the law as instructed by the court.

As the People point out, the prospective juror's responses also raised the possibility that her religious views could have interfered with her ability to sit as a

22

juror. Indeed, she believed "[s]omewhat" that these views could have a substantial impact on her decision in the case. We need not decide whether these responses alone would have sufficiently buttressed a challenge for cause, though, because we conclude that even if these responses could have been disqualifying in the absence of any contrary responses, the prospective juror's other responses in this case also mattered. At most, the prospective juror's concerns about the death penalty created an ambiguity when considered together with the juror's other responses. (See *People v. Avila*, *supra*, 38 Cal.4th at p. 533 [analyzing the prospective juror's written responses "taken together"].) Not only did the juror's responses indicate that she would not always or automatically reject the death penalty, but she also answered "Yes" to the question that " 'directly address[ed] the pertinent constitutional issue' in *Witt* — i.e., whether the prospective juror could temporarily set aside his or her personal beliefs and follow the court's instructions in determining penalty." (*People v. McKinnon, supra*, 52 Cal.4th at p. 645.)

On voir dire, the juror might have demonstrated that her personal beliefs were of such overwhelming weight that they would substantially burden her ability to fulfill her oath at a potential penalty phase. (See *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 23-24 [deferring to the trial court's resolution of the prospective juror's equivocal and conflicting responses on the questionnaire and in voir dire]; *People v. Whalen* (2013) 56 Cal.4th 1, 48 ["Although her written questionnaire responses were somewhat ambiguous, her answers on oral voir dire made it quite clear that because of her beliefs, she was unwilling to vote to impose the death penalty under any circumstances, even if this were the most 'horrible crime in history.' "].) Alternatively, the juror might have reaffirmed in open court her written response to question No. 9d that she would set aside those views and follow the court's instructions. But such further probing never took place, and nothing in the record suggests that the trial court had a clear basis on which to

23

resolve the ambiguity. (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 782.).
Accordingly, the juror's written responses do not clearly establish that she should
have been disqualified. (See *Stewart*, *supra*, 33 Cal.4th at pp. 448-449.)

*People v. Duff* (2014) 58 Cal.4th 527 underscores this very point. There, a
prospective juror's questionnaire revealed "someone profoundly conflicted as to
whether she could ever personally vote to impose the death penalty." (*Id*. at p.
541.) After identifying herself as Catholic, the juror stated that she did not believe
she could send someone to his or her death, that she believed only God had the
right to take away life, that the conflict between her beliefs and the efficacy of
deterrence was one that she has " 'not yet been able to resolve,' " but that she
would " 'err on the side of God.' " (*Id*. at pp. 541-542.) On the other hand, the
juror also responded that she could give honest consideration to both penalties,
that her views would not cause her automatically to vote against the death penalty,
and that she " 'would follow the law' " — even though she was " 'not sure [she]
could live with it' " and recognized that God would hold her " 'accountable' " for
her acts. (*Id*. at p. 542.) Because the questionnaire left it "unclear" whether the
prospective juror was could or would follow the law, we found that the trial court
and counsel then "appropriately" used voir dire to resolve the ambiguity. (*Ibid*.)

The People seek to rely on *People v. Avila*, *supra*, 38 Cal.4th 491. But that
reliance is misplaced. Although the questionnaire responses of Prospective Juror
O.D. in that case included an acknowledgement at the outset concerning a juror's
duty to follow the law and an indication that the juror could set aside his feelings
and follow the law, O.D. nonetheless went on to respond that he would, *in every
case and regardless of the evidence presented*, "automatically vote for something
other than first degree murder so as not to reach the penalty phase, automatically
vote for a verdict of not true as to the special circumstances alleged so as not to
reach the penalty phase, and, automatically vote for life imprisonment without the

24

possibility of parole if there were a penalty phase." (*Id.* at p. 532.) O.D. also wrote, " 'I was taught that there should be no reason to kill and I will continue to think this way.' " (*Ibid.*)

In contrast to the situation we encountered in *Avila*, Prospective Juror No. 129's written responses did not clearly reveal personal views that would interfere with her ability to judge the penalty based on the evidence presented. Rather — as in *Duff* — her written responses, at worst, left it uncertain whether she had the ability to perform as a juror. Because those responses did not "clearly reveal" an inability to perform her duties, the trial court erred in granting the prosecution's challenge for cause without examining the juror in court to ascertain her true state of mind. (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 782.) When a trial court errs in excusing a prospective juror for cause because of that person's views concerning the death penalty, we must reverse the penalty. We do so in this case. (*Id.* at p. 783; accord, *Gray v. Mississippi* (1987) 481 U.S. 648, 659-667.)

### 2. *Prospective Juror No. 16*

Prospective Juror No. 16, was examined in court after completing the questionnaire. Her written and oral responses conveyed inconsistent views about the death penalty. At first, her questionnaire responses indicated that she had no religious, moral, or personal beliefs that would interfere with her ability to impose the death penalty. Yet when asked for her general feelings about the death penalty, she wrote, "I don't feel that I would be able to take a life" and added that the death penalty served no purpose. Although she stated that she would automatically refuse to vote for the death penalty without regard to any aggravating or mitigating factors regarding the crime and the defendant's background and character, she said she would change her answer and set aside her views and follow the law if so instructed by the court. On the other hand, when

25

asked if she would be able to follow an instruction not to consider the monetary cost of keeping the defendant in prison for life or executing him, she marked "No."

During voir dire, the juror disavowed her questionnaire response and said she *would* be able to disregard the monetary cost of keeping defendant in prison or executing him. When asked why she had said otherwise on the questionnaire, she replied, "Well, I really don't feel that I should be — should take — or be a part of taking another person's life. [¶] But if the law says you — I have never broken the law in my life, and I don't intend to do one now." She also said she would be able to follow the law as well as weigh and consider the aggravating and mitigating circumstances. The prosecutor challenged the prospective juror on the basis of her "contradictory" and "conflicted" answers. He also noted that she was not being forthcoming, that she rolled her eyes upon being called into the jury box, that she seemed "pretty entrenched in her views" — and therefore suspected that she had "an agenda." Defense counsel admitted that "there's some ambivalence" in the juror's responses, but argued that she did not exhibit "the inability to follow the law that I think is required." The trial court agreed with counsel that the juror's responses could be viewed as "equivocal." Based on its finding that the juror's true views would "substantially impair" her ability to impose the death penalty, the trial court sustained the challenge.

The trial court was able to observe and speak with the prospective juror, so we review its ruling for abuse of discretion. (*People v. Scott* (2015) 61 Cal.4th 363, 378-379 (*Scott*).) The juror here stated on her questionnaire that she would not be able to follow the court's instruction to disregard the monetary cost of imprisonment or execution in selecting the appropriate penalty. In voir dire, she changed course and said she would be able to follow the court's instructions on this topic, connecting her prior answer to her reluctance to be involved with the

26

death penalty. We defer to the trial court's resolution of these conflicting responses, because that court had the opportunity to assess the juror's tone, apparent level of confidence, and demeanor. (*People v. Capistrano* (2014) 59 Cal.4th 830, 862.)

B. Asserted Error in Denying Defendant's *Batson*/*Wheeler* Motion

Defendant, who is Latino, contends that the prosecutor violated his state and federal constitutional rights to equal protection and a jury drawn from a fair cross-section of the community by peremptorily excusing two Latino prospective jurors, L.R. and R.C. (See *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.) The claim lacks merit.

The familiar *Batson*/*Wheeler* inquiry consists of three distinct steps. The opponent of the peremptory strike must first make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. If a prima facie case of discrimination has been established, the burden shifts to the proponent of the strike to justify it by offering nondiscriminatory reasons. If a valid nondiscriminatory reason has been offered, the trial court must then decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168; *Scott*, *supra*, 61 Cal.4th at p. 383.) Because the trial court ruled that defendant had failed to make out a prima facie case of discrimination, but did so in reliance on "the since disapproved 'strong likelihood' standard," we independently review the record then before the trial court to determine whether it supports an inference that the prosecutor excused either of these jurors on the basis of race. (*People v. Edwards* (2013) 57 Cal.4th 658, 698.)

Defendant's claim of discrimination rested solely on the fact that the prosecutor exercised his first two peremptory challenges against Latino

27

prospective jurors and that defendant was Latino. We have previously recognized that removing members of an identifiable group, where the defendant is a member of that group, is a fact that "may prove particularly relevant" to the first-stage inquiry. (*Scott*, *supra*, 61 Cal.4th at p. 384.) But a prima facie case of discrimination can be established only if the *totality* of the relevant facts gives rise to an inference of discriminatory purpose. A court, in particular, may also consider nondiscriminatory reasons "that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Ibid*.)

The record in this case clearly establishes nondiscriminatory reasons for excusing Prospective Jurors L.R. and R.C. L.R.'s questionnaire responses revealed that she had been convicted of shoplifting; that her sister had been convicted of a drug charge and had been incarcerated; and that she strongly disagreed with the proposition that the rights of persons charged with crimes are better protected than the rights of crime victims and that harsh punishment is the best solution to the crime problem. She also stated that she would impose a higher burden than proof beyond a reasonable doubt in a capital case and would require proof "without doubt" that "the defendant was 100% guilty." The record thus contained a compelling nondiscriminatory justification for excusing L.R. (See *Scott*, *supra*, 61 Cal.4th at p. 385.)

R.C.'s questionnaire responses revealed that she did not "believe" in the death penalty, that she doubted it served any purpose, and that her religious convictions on the topic would interfere with her ability to sit as a juror in a murder case or in a case involving the death penalty. Although she marked "yes" when asked whether she could set aside her personal feelings and follow the court's instructions, she also wrote, "I don't believe that another life should be taken and although I don't believe in it that I could not rule for it." Despite the

28

responses above, she marked "no" when asked at the end of the questionnaire whether her religious beliefs would have a substantial impact on her decision.

In voir dire, R.C. said that she "probably" could get to the point of believing that she "could" impose the death penalty. Nonetheless, she reaffirmed in open court her previous responses that her religious beliefs would interfere with her ability to be a juror in a murder or death penalty prosecution and added that her beliefs were "firmly held." R.C. recalled that when a co-worker was murdered, she had thought that the murderer "probably" deserved to die. On the other hand, she said, "I don't know that I could get to that point if I was actually involved . . . in the decision."

R.C. may have offered inconsistent responses as to her ability to consider the death penalty, but a prosecutor could readily have concluded that her true views were consistent with her confession in voir dire that she had "never been able to say, 'Well, he should be dead.' " This prospect was sufficient to dispel any inference of discrimination. (*Scott*, *supra*, 61 Cal.4th at p. 385.) The trial court therefore did not err in denying the *Batson*/*Wheeler* motion.

### III. GUILT PHASE ISSUES

#### A. Asserted Insufficiency of the Evidence that Defendant Was Involved in the Murder

Defendant argues that the evidence was insufficient to convict him of murder or robbery. In his view, the evidence showed that his brother David Zaragoza committed the crimes by himself and there was insufficient evidence that defendant was even present. We disagree.

When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a

29

reasonable doubt. (*People v. Elliott* (2013) 53 Cal.4th 535, 585.) Our review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence. (*Id.* at p. 92; *People v. Maury* (2003) 30 Cal.4th 342, 403.) It is the duty of the jury to acquit the defendant if it finds the circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) But the relevant inquiry on appeal is whether, in light of all the evidence, "*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Towler* (1982) 31 Cal.3d 105, 118.)

The sole issue in dispute in this case was the identity of the shooter. The evidence that defendant was the shooter was entirely circumstantial — but it was sufficiently substantial to uphold his convictions.

First, there was substantial evidence that David Zaragoza did not commit the robbery by himself. Carol Maurer told another neighbor at the crime scene that she had seen two men running down Cameron Way after hearing gunfire; she reiterated that fact to a deputy sheriff that night and to a defense investigator in May 2000; and she testified at trial that she had seen two men fleeing. Although Cynthia Grafius, who lived east of Maurer, saw only one person running down the street, it was entirely possible that the other suspect had been ahead of or behind the man she saw from her kitchen window, given that William Gaines testified that the men in flight were separated by about 10 feet. Indeed, the trial court observed that Grafius's vantage point blocked her from a view of the entire street.

The circumstances of the robbery and the murder also supported the conclusion that two people were involved. William Gaines, who watched David Zaragoza flee eastbound down Cameron Way, testified that David was between 10 and 30 feet away when the shots rang out and Gaines ducked behind his station wagon. At the time that Gaines heard the shots, David Zaragoza's back was to Gaines, and Gaines did not see any muzzle flash coming from David's direction. Nor did he ever see David turn around and head up the driveway. Yet according to the pathologist, the gun used in the murder left three contact wounds and a set of stipple marks, which indicated that the muzzle could have been no more than 18 inches away from the victim.

Additional forensic evidence supported the theory of a second assailant. Both David Zaragoza and defendant were shorter than David Gaines, and the Gaines's driveway sloped upward from the street to the house. But the pathologist testified that two of the bullets entered David Gaines on a *downward* trajectory. A downward trajectory suggested that the shorter gunman must have been on higher ground — that is, between David Gaines and the house, not approaching David Gaines from the street.

David Zaragoza was also unlikely to have committed these crimes alone. He had substantial intellectual deficits. The Gaines's house was 6.1 miles from defendant's residence, yet David had no driver's license, was driven everywhere by family members, and had not driven a car in over a dozen years — if ever. David also was wearing pants that had no pockets that night. If David had a gun that night, it was odd, under the circumstances, that he did not use it during the robbery of William Gaines and that William Gaines did not see it. All this suggested that the gunman was someone other than David Zaragoza.

Second, there was substantial evidence to connect defendant to the crime. Defendant admitted he was with his brother David that evening — although David

31

initially attempted to cover that up and even removed defendant's photograph from the board and care home. The fruits of the robbery — i.e., the Pyrex salad bowl and lid — were found in the garbage bin outside defendant's residence. Both items had previously been inside defendant's house: the bowl was in a kitchen garbage bag that defendant had taken out of his mother's hands to place in the bin outside, and the bowl's blue lid was in a coffee can that the police saw on a coffee table during their first visit.

A receipt from a Jack in the Box located less than a mile from the Gaines residence was also found in the garbage bin outside defendant's house. The receipt was time-stamped at 12:03 a.m., approximately 45 minutes after the murder. The defense argued vigorously that the receipt reflected a purchase by defendant's sister, Nina Koker. But the evidence showed that Nina was at the home of Raymond Padilla's cousin, dealing with the locksmith who had helped recover her keys from her locked car, until at least 12:08 a.m., and may not have left there until after 1:00 a.m.

The record also shows that it was defendant, not David, who was familiar with Gaines Liquors. Paul Banning, a clerk, testified that he recognized defendant as a customer who came to the store in the afternoons and evenings. Stella Lee Tahod, defendant's sister-in-law, testified that defendant sometimes walked her two daughters the block or two to get candy at the store. Billy Gaines, who was the murder victim's nephew, testified that defendant had come to the store and had asked about the surveillance camera. Billy testified in January 2001 that this conversation had occurred in the early afternoon on the day before the murder, although there was evidence that Billy may have mistaken as to the date or time. And defendant himself admitted that he had been to Gaines Liquors on many occasions, including on the Monday or Tuesday prior to the murder.

32

The evidence also connected defendant to the area around the Gaines residence before and after the murder.

Howard Stokes testified that on the Monday prior to the murder, he saw a man resembling David Zaragoza walking towards the Gaines residence late at night. When William Gaines arrived home from work, the man hid behind a tree. Defendant admitted that he and David were together that night after having dinner at the Tahod home.

Around noon on the day after the murder, Stanley Monckton saw defendant driving a car slowly through the neighborhood. Defendant was in an older, white or cream Honda, like defendant's mother's car. Interestingly, defendant told police that he drove straight back from Tracy early on that Saturday morning to his mother's house to return the car, and that she then drove him home. His mother told police, however, that defendant did not return the car until 2:00 or 3:00 p.m.

Finally, the timeline tended to rebut the theory that David Zaragoza had borrowed his mother's car, committed the robbery and murder, returned the car to defendant's house, and walked home before midnight. The murder victim's watch stopped at 11:16 p.m. According to the defense theory, David had to run to the car after the shooting, drive the 6.1 miles back to defendant's house, wrap the salad bowl in a Grocery Outlet bag and place it in the kitchen garbage, slip the salad bowl lid into the coffee can in the room where his brother was still sleeping, and leave on foot no later than 11:30 p.m. — given that defendant told police that he woke up between 11:00 p.m. and 11:30 p.m. to discover that David was gone. David then had to dispose of the murder weapon and walk the 2.3 miles to the board and care home, where his roommate, Ernie Williams, told police that he arrived near the end of the David Letterman show, which began at 11:00 p.m. Even defendant concedes it was "improbable" that David could have accomplished all this in the allotted time.

The record, in sum, contained substantial evidence that David did not commit these crimes by himself, that defendant was present at the scene with his brother, and that defendant was the shooter.

B. Denial of Defendant's Request to Subpoena David Zaragoza

Defendant and his brother, David Zaragoza, were originally charged together. During a pretrial hearing shortly after arraignment, David blurted out in court that he shot and killed the victim, that his brother was "not involved in none of this," and that he wanted to be sentenced that day. As the parties discussed future court dates, David pulled down his pants and defecated. Bailiffs then removed him from the courtroom. David was subsequently found incompetent to stand trial.

When the defense subpoenaed David to testify, David's attorney filed a motion to quash, invoking the privilege against self-incrimination on his client's behalf. (Evid. Code, § 940.) Because the district attorney would not stipulate to David's unavailability, the trial court conducted a hearing on the motion. At the hearing, David's attorney asserted that he had the authority and responsibility to invoke the privilege on his client's behalf, given the finding that his client was incompetent to stand trial. David's attorney also expressed his understanding that the question presented was "about [David's] availability and that [defense counsel] really is seeking my client to be found unavailable" so that David's confession at the pretrial hearing could be introduced. (See Evid. Code, § 1230.) The trial court agreed that defendant had issued the subpoena "to show that [David] is unavailable to testify," since "[t]here is no other way he can do that."

Defense counsel offered no objection to the assertion of the privilege by David's attorney, on behalf of his client (David). Indeed, defense counsel had nothing to say at all in response to the argument presented by David's attorney,

34

other than to clarify that (once David's unavailability had been established) he intended to introduce not only the postarraignment confession, but also statements David had made admitting his involvement in the murder to his mother, his brother Reynaldo, and a fellow inmate.

Over the district attorney's objection, the trial court ruled that David's attorney was entitled to invoke the privilege against self-incrimination on his client's behalf. Based on its conclusion that David was unavailable, the trial court quashed the subpoena.

On appeal, defendant for the first time complains that David's attorney lacked the authority to invoke the privilege on David's behalf and claims that the trial court's finding of unavailability deprived him of his state and federal constitutional rights to compulsory process, to present a defense, and to a reliable verdict in a capital trial. But defendant plainly forfeited this claim by failing to object at the time David's attorney asserted the privilege and by failing to identify the substance, purpose, and relevance of David's live testimony. (Evid. Code, § 354, subd. (a); *People v. Fuiava* (2012) 53 Cal.4th 622, 691; *People v. Blacksher* (2011) 52 Cal.4th 769, 821; accord, *State v. Diaz* (Conn.App.Ct. 2006) 893 A.2d 495, 498.)

Indeed, the record tends to show that defendant had no interest in actually having his brother David testify at trial. Rather, the apparent purpose of the subpoena was to have David declared unavailable so that his statements against penal interest, in and out of court, could be introduced. Defendant's reluctance to offer David as a live witness was understandable, as David had given a number of different statements about his involvement (or noninvolvement) in the incident. David had twice denied to law enforcement any involvement in the murder. He told his mother, on the other hand, that he left the Koker residence after defendant fell asleep, was given a ride by a White male, and had no other recollection of

35

what occurred that night. He told his half brother, Eddie Tahod, that the White male had flashed a gun before David "lost track of things." And he told his brother Reynaldo Zaragoza that the White male had shot someone at a residence in north Stockton and later dropped him off — but subsequently confessed to Reynaldo that he had committed the murder by himself. Counsel thus could reasonably have decided, given the additional uncertainty posed by David's incompetency to stand trial, that the safest course was to rely on David's prior statements, rather than to risk having David testify.

Having gambled and lost with that strategy, defendant cannot belatedly argue here that he is entitled to a reversal in order to pursue some other strategy. " ' " 'If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.' " ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) We therefore need not consider the novel question whether an attorney may validly invoke the privilege against self-incrimination on behalf of a codefendant, where the codefendant has been declared unfit to stand trial, in the face of a criminal defendant's constitutional right to compulsory process and to present a defense.

C. Exclusion of a Segment from David Zaragoza's Videotaped Interview

The key evidence connecting David Zaragoza to the robbery of William Gaines included the numerous bits of paper containing David's name that were recovered next to and around the driver's side door of Gaines's car. The prosecution theorized that the papers fell out of David's *shirt* pocket at some point when he assaulted Gaines, struggled with Gaines over the brown paper bag containing the Pyrex bowl, and reached down with both hands to pick up the bag after the bag fell to the ground. The defense, on the other hand, contended that the

36

papers must have fallen out when David pulled a gun out of his *pants* pocket. When the prosecution introduced David's admission during his videotaped interview that the pants he was wearing that night did not have pockets, the defense requested permission to show the jury a different segment of the videotaped interview. In the segment identified by the defense, the interviewing officers asked David, who had a tobacco pouch and a lighter in his shirt pocket, to stand and then bend over to pick up something from the ground. Neither the tobacco nor the lighter fell out of David's pocket.

The People objected that the interviewing officers' experiment was irrelevant, and more prejudicial than probative. The trial court agreed that "[t]here's a lot of things that aren't the same" in the experiment as compared to the circumstances at the crime scene, and sustained the objection. Defendant claims on appeal that the evidence was relevant and, for the first time, that its exclusion deprived him of his due process right to present a complete defense and his Eighth Amendment right to a reliable guilt determination. We deem his federal claims preserved only to the extent that they represent merely a gloss on the arguments he presented in the trial court. (*People v. Streeter* (2012) 54 Cal.4th 205, 236-237.)

A ruling admitting or excluding the results of an experiment or demonstration as evidence for the existence or nonexistence of a material fact in controversy "is a determination largely within the discretion of the trial court and its ruling will not be disturbed except upon a clear showing of an abuse thereof." (*Grupe v. Glick* (1945) 26 Cal.2d 680, 685.) Experimental evidence is admissible only when the results are relevant, the experiment was conducted under conditions substantially similar to those of the actual occurrence, and the presentation will not unduly delay the trial or confuse the jury. (*People v. Lucas* (2014) 60 Cal.4th 153, 228.)

This is not a case where the trial court abused its discretion. Given the dissimilarities between the experiment conducted at the interview and the circumstances at the crime scene, it was within the bounds of the trial court's discretion to exclude the experiment. The experiment showed that a pouch of tobacco and a lighter did not fall out of David Zaragoza's shirt pocket when he bent over. But the question in this case was whether small pieces of *paper* — more than a dozen in all — could fall out of his shirt pocket. Moreover, in the experiment, David Zaragoza simply walked to a certain spot and bent over to pick up an item. At the crime scene, however, the papers allegedly fell out after David punched William Gaines twice and struggled with him to take the bag, which fell to the ground. David then quickly reached down with both hands to scoop up the bag and ran away.

Given the different size, weight, and number of items in David's pocket during the experiment as well as the lack of speed and suddenness when David bent over to pick up an item from the floor during the interview, it was not unreasonable for the trial court to conclude that the experiment lacked the necessary foundation to be relevant. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 227.) Nor did defendant suffer any deprivation of his federal rights, given the experiment's limitations. (*Ibid*.; see *People v. Mincey* (1992) 2 Cal.4th 408, 442.)

D. Failure to Provide the Defense with a Copy of the Jack in the Box Videotape

Defendant claims that the prosecution violated its discovery obligations under section 1054.1, as well as its constitutional duty to disclose exculpatory evidence, by failing to provide the defense with a usable copy of the videotape from the night of the murder obtained from the Jack in the Box near the Gaines residence.

The Jack in the Box receipt that was recovered from the garbage bin outside defendant's home recorded a transaction less than an hour after the murder. The parties vigorously disputed at trial the identity of the person who had gone to this Jack in the Box that night. In an effort to bolster the evidence of identity, police investigators visited the Jack in the Box and recovered the surveillance videotape of the drive-through for the relevant period. Detectives Alejandre and Wuest viewed the videotape at the Jack in the Box.

According to the prosecution, these police officers stated that the grainy, monochrome videotape offered only a very limited view of the vehicles as they approached the drive-through. The corner of the vehicle that was visible could have belonged to a Toyota, a Honda — or, indeed, "any car from 1979 to 1999" that was beige, brown, white, or a faded color. The videotape could not exclude defendant's mother's car, which was in his possession that night, or his sister's vehicle. The videotape did not show the driver, either.

Because the videotape had "no probative value whatsoever," the prosecution decided not to use it. A copy of the tape was not provided to the defense, however, because the recording system used by Jack in the Box was not compatible with VHS machines and the tape could not be converted to play on a VHS player. The videotape's existence was nonetheless known to counsel, and the prosecution made the videotape available to the defense to be viewed, as police investigators already had, at Jack in the Box.

We perceive no violation of the prosecution's statutory or constitutional discovery obligations. By alerting the defense to the existence of the videotape and making it available for viewing offsite, the prosecution complied with its obligations under section 1054.1, subdivision (e) to disclose exculpatory evidence in its possession. (See *Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1242 [the current discovery statutes, like the earlier ones, provide that the

39

prosecution's obligations can be satisfied "by making the information available 'for inspection and copying' "].)  Even if the prosecution had a duty to supply a "usable copy," as defendant contends, its obligation would have been excused on the ground of impossibility.  The prosecutor stated that "we had someone come in with a particular machine that . . . supposedly converts these kind of videotapes from their particular format to normal VHS tape," but the conversion could not be completed.  Indeed, defense counsel admitted that a copy "turned out not be available, as I understand it, through whatever technical reasons."  The trial court therefore did not abuse its discretion in concluding that "so long as [the defense] had access to the actual physical evidence, it was not necessary for the prosecutor to search the world to see whether there's proper technology to do the transfer." (See *Hill v. Superior Court* (1974) 10 Cal.3d 812, 816-817.)

Defendant contends that the prosecution further violated its duties by failing to provide "clear directions as to how [the defense] could view the tape." But defendant does not explain why the prosecution would have been obligated to facilitate a screening of the tape, given defense counsel's statement that he "didn't need a copy" of the Jack in the Box tape if the prosecution was not going to introduce it.  Nor does defendant cite any authority, or otherwise offer a persuasive argument, for requiring the prosecution to volunteer directions for viewing the tape.  In any event, defense counsel appeared to have been well aware of all he needed to know about how to view the tape, since he admitted to the trial court that "the viewing machine I was told existed only at the Jack in the Box."

For similar reasons, we conclude that the prosecution did not deny defendant his rights under *Brady v. Maryland* (1963) 373 U.S. 83.  To challenge a conviction on *Brady* grounds, defendant must show that the prosecution suppressed evidence, that the suppressed evidence was favorable to the defense, and that it was material.  (*Barnett v. Superior Court* (2010) 50 Cal.4th 890, 900-

40

901; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043.) Defendant has failed to establish that the prosecution, by alerting him to the existence of the videotape and by making it available for him to view at the Jack in the Box, suppressed any information. (*Salazar*, at p. 1049 [evidence is not suppressed when it "is available to a defendant through the exercise of due diligence"]; accord, *Amado v. Gonzalez* (9th Cir. 2014) 758 F.3d 1119, 1137 ["defense counsel cannot ignore that which is given to him or of which he otherwise is aware"].) Nor has defendant discharged his burden to show that the evidence allegedly withheld was favorable and material. (*Barnett*, at pp. 900-901.) Defendant does not deny that the prosecutor's secondhand description of the videotape did not reveal any evidence favorable to the defense. He instead hypothesizes that favorable inferences might have been discovered if the defense had viewed the tape. But speculation that favorable and material evidence might be found does not establish a violation of *Brady*. (*People v. Williams* (2013) 58 Cal.4th 197, 259.)

E. Refusal of Pinpoint Instruction on Circumstantial Evidence

The jury was instructed how to evaluate circumstantial evidence with CALJIC No. 2.01, as modified at defendant's request: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but, two, cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. [¶] In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence as to any particular

41

count permits two reasonable interpretations, one of which points to a finding of guilt and the other to a finding that guilt has not been proven, you must adopt that interpretation which points to a finding that guilt has not been proven and reject that interpretation which points to a finding of guilt. [¶] If, on the other hand, one interpretation of this evidence appears to you to be reasonable, and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

The trial court rejected defendant's pinpoint instruction attempting to link the principle above to its theory of the case. The rejected instruction provided: "If the evidence permits two reasonable interpretations, one of which points to the guilt of the defendant and the other to the guilt of [David Zaragoza], you must reject the interpretation that points to the defendant's guilt and return a verdict of not guilty." The court expressed concern that the jury could "easily" interpret the instruction to mean that "the evidence can only point to the guilt of one or [the] other," even though the jury in this case could conclude "that the evidence points to the guilt of both." The court also noted that there were "sufficient other instructions" to make the point "I think that you're trying to make, which is if they think it was David alone, they have to acquit the defendant." What we find is that the refusal to give the requested instruction was not error.

A trial court may properly reject an instruction proposed by the defendant if the instruction incorrectly states the law; is argumentative, duplicative, or potentially confusing; or is not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) The instruction proposed by defendant, as the trial court pointed out, was an incorrect statement of the law. The proposed instruction posited that only one person (defendant or his brother David) could be "guilty." Yet, as defendant himself concedes, the jury could have believed that defendant shot David Gaines "as part of the robbery" committed by defendant and his

42

brother. Under that version of the events, defendant could be guilty of murder. But so could David, as an accomplice under the instructions given to the jury, if the jury found that the murder was a natural and probable consequence of the robbery. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 262-263.) Because it was possible to interpret the evidence as pointing towards David's guilt of the murder as an accomplice — and yet *also* find that defendant was guilty of murder as the shooter — the instruction was erroneous and thus properly rejected.

To the extent defendant merely sought to advise the jury that only one man could have been the shooter, the trial court correctly concluded that the matter was covered adequately by the other instructions. (*People v. Jones* (2012) 54 Cal.4th 1, 81-82; *People v. Clark* (2011) 52 Cal.4th 856, 975.) Under CALJIC No. 2.01, the jury was instructed that if the circumstantial evidence was reasonably susceptible to two interpretations, only one of which pointed to guilt, it was obligated to reject that interpretation and adopt the interpretation pointing to a finding that guilt was not proven. Moreover, the jury was instructed that the burden was on the People to prove beyond a reasonable doubt that defendant was the person who committed the charged crimes and that defendant was present at the time the crime was committed. (CALJIC Nos. 2.91, 4.50.) These instructions correctly advised the jury what to do if it harbored a reasonable doubt that David was the shooter.

The cases on which defendant relies are plainly distinguishable. In *People v. Rogers* (2006) 39 Cal.4th 826, the trial court failed to instruct the jury how to evaluate the sufficiency of circumstantial evidence, except as to evidence of mental state, thus depriving the jury of guidance as to how circumstantial evidence of identity should be evaluated. (*Id.* at p. 885; see also *People v. Fuentes* (1986) 183 Cal.App.3d 444, 455 ["None of the required instruction, which is set forth in CALJIC No. 2.01, was given."].) Here, by contrast, the jury not only received the

general instruction as to circumstantial evidence, but was also told that the standard of reasonable doubt applied specifically to the issue of identity.

F. Refusal of Request to Modify the Instruction on Motive

Defendant contends that the trial court erred in denying his request to modify the pattern instruction concerning motive. The trial court did not prejudicially err.

The jury was instructed about motive in accordance with CALJIC No. 2.51, as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. [¶] Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." The defendant proposed, but the trial court rejected, a modification of the final paragraph of the instruction so that it would read: "Presence of motive IN THE DEFENDANT OR [DAVID ZARAGOZA] may tend to establish THAT PERSON'S GUILT. Absence of motive IN THE DEFENDANT OR [DAVID ZARAGOZA] may tend to establish THAT PERSON'S innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." The trial court rested its rejection of the instruction on the ground that the jury was not deciding David Zaragoza's guilt in this proceeding, and that defendant remained free to argue that David "had motives."

The trial court properly refused the modified instruction. What that instruction directed the jury to consider is a third party's guilt, which in this case would have been a distraction from the jury's duty to decide whether the prosecution had proven defendant's guilt beyond a reasonable doubt. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 286 [rejecting defense modification to CALJIC No. 2.03 that would have instructed the jury to consider a third party's false and

44

misleading statements as evidence of his consciousness of guilt].)  As stated in the preceding section, this was not a situation in which only one of the two men could be guilty.  Moreover, the pattern instruction, which correctly stated the law (*People v. Daya* (1994) 29 Cal.App.4th 697, 714), did not preclude the jury from considering David Zaragoza's motives in analyzing whether there was a reasonable doubt about defendant's guilt.  Indeed, defense counsel discussed David's possible motives in argument.

Even if the jury had been instructed with the modified instruction, it is not reasonably probable that defendant would have achieved a more favorable result. (*People v. Earp* (1999) 20 Cal.4th 826, 887.)  The issue of David Zaragoza's motivation for the robbery was essentially moot, given the undisputed evidence that he *committed* the robbery.  The question for this jury, as far as motive was concerned, was whether defendant may have wanted to support or protect his brother while his brother was committing the robbery.  Evidence of *David's* motivation sheds little light on that question.  Accordingly, any error would have been harmless.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 720-721.)

G.  Denial of Motion to Suppress Defendant's Statements

Defendant contends that the trial court erred in failing to suppress his statements to police on June 13 and 14, 1999, as the product of an illegal detention and an illegal arrest, respectively.  The claim lacks merit.

*1. Statements Made on June 13, 1999*

For his initial interview, defendant accompanied two detectives from his home to the sheriff's department. There, he was interviewed for two hours, and then driven to his mother's home.  Defendant claims that his consent to accompany the detectives was not voluntary and was instead the product of an implied assertion of authority.  The trial court ruled that defendant's consent was

"clearly voluntary."  We review the trial court's characterization of defendant's contact with the detectives as a consensual encounter independently, but we review its factual findings under the deferential substantial evidence standard. (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

On June 13, 1999, Detectives Alejandre and Wuest drove up to the Koker residence and found defendant sitting on the front porch.  The detectives were in plainclothes (jeans) and were driving an unmarked vehicle.  No other police units or personnel were present.  After introducing themselves, they informed defendant that they were investigating a homicide that had occurred two days earlier and mentioned that they had already talked to his brother.  When they asked whether defendant would be willing to come down to the sheriff's department for an interview, defendant said he would.  Defendant remained on the porch, unsupervised, while the detectives went into the house to talk to defendant's sister. When the detectives exited the house, they asked defendant whether he was ready to accompany them to the sheriff's department.  Defendant said he was.  After a "real quick patdown" for weapons, defendant got in the front passenger seat.  He was not handcuffed or otherwise involuntarily restrained.

About 15 minutes later, defendant and the detectives arrived at the station and went to an interview room, which remained unlocked throughout.  Defendant was told that he was not under arrest, that the interview was voluntary and could be stopped at any time, and that they would drive him home at the end of the interview.  Defendant appeared to understand.  During the course of the interview, defendant agreed to a participate in a computer voice stress analysis and to allow photographs of his injuries.  At the end of the interview, he rode with the detectives in the unmarked vehicle to his mother's house.

A detention occurs when the officer, by means of force or show of authority, has restrained a person's liberty.  (*Terry v. Ohio* (1968) 392 U.S. 1, 19,

46

fn. 16.) Unlike a consensual encounter, a detention must be supported by reasonable suspicion the person is involved in criminal activity. (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The facts here demonstrate that defendant was not detained by the officers. Defendant was told that he was not under arrest and that the interview was "voluntary." He was reminded that he could stop the questioning at any time, and that he would then be driven back home. The detectives conducting the interview were dressed casually, they displayed no weapons and uttered no commands. They asked defendant for his permission before each of the investigative steps they undertook, and they at no point placed defendant under any restraints. Indeed, defendant was left alone on the porch after the detectives secured his consent to accompany them to the station. Given these facts, a reasonable person in defendant's situation would not have believed he or she lacked the freedom to leave, decline the detectives' requests, or otherwise terminate the encounter. (*People v. Zamudio*, *supra*, 43 Cal.3d at pp. 344-345; *People v. Hughes* (2002) 27 Cal.4th 287, 328-329 ["the record amply supports the trial court's factual finding that defendant freely consented to remain for the purposes of speaking with [the] [d]etective [] . . . and being transported in handcuffs to the police station for further questioning," where the defendant was handcuffed for safety reasons and expressed no reluctance about being handcuffed]; accord, *People v. Anderson* (Ill.App.Ct. 2009) 917 N.E.2d 18, 26.)

### 2. *Statements Made on June 14, 1999*

The next day, Detective Wuest arrested defendant and his brother outside the county mental health facility. Defendant contends that his postarrest statements should have been excluded as the fruits of an illegal arrest without probable cause. The trial court denied his suppression motion, ruling that there was "a strong suspicion of probable cause" at the time defendant was arrested.

47

Where, as here, the underlying facts are undisputed, we independently review whether those facts constitute probable cause for an arrest. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) Probable cause is shown "when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime." (*People v. Celis* (2004) 33 Cal.4th 667, 673.)

The police had probable cause here. The investigating officers quickly identified David Zaragoza as a suspect based on the personal papers he left at the scene, including his book-and-release form and Medi-Cal identification card. Further investigation revealed that a second person must have been involved in the robbery homicide, and created a strong suspicion that the second person was defendant. William Gaines told investigators that he saw his assailant running eastbound down the street at the same time he heard the gunshots. In light of the contact wounds on David Gaines's body, Detective Wuest did not believe that one person could have been close enough to David Gaines to cause the contact wounds while also running down the street. Indeed, one of the neighbors confirmed to a deputy sheriff that she saw two people running down the street after shots were fired.

Suspicion focused on defendant as the detectives investigated David Zaragoza's claim not to have been with defendant on the night of the murder. Not only had David announced that he was meeting his brother when he left the board and care home between 8:00 p.m. and 9:00 p.m. that night, but defendant himself admitted that he had been with his brother at that time. Moreover, the fruits of the robbery — i.e., the Pyrex salad bowl and lid — were found in the garbage bin outside defendant's home a short time after the murder. A receipt from a Jack in the Box located less than half a mile from the Gaines residence, reflecting a transaction that occurred not long after the murder, was also found in the garbage

bin outside defendant's home. Taken together, these facts supplied a strong suspicion that defendant was a participant, along with his brother, in the robbery homicide. (*People v. Kraft* (2000) 23 Cal.4th 978, 1037.)

H. Failure to Excuse Juror No. 8

Defendant claims the trial court violated his constitutional rights to due process and to an impartial jury by failing to conduct a full inquiry into a seated juror's potential bias and by failing to discharge that juror at the guilt phase. We reject the claim.

During the presentation of the defense case, Juror No. 8 sent a note to the trial judge. The note recited that the juror and Steve Gaines, the victim's brother, both worked at Save Mart, that the two had talked on the phone, and added: "I think this should be no problem, but you should know." Under examination by the court, the juror explained that he had only just realized the connection to David and William Gaines. The juror had never met Steve Gaines in person, but had talked with him on the phone at least three times in the preceding three or four months, and expected to have contact with him again in the future. Their phone conversations, which all predated the trial, involved work-related matters, such as installation of a punch clock in the store. The juror pledged to avoid contact with Steve Gaines during the trial. When defense counsel asked whether returning a verdict "that's not proper with Mr. Gaines" would cause the juror any problems, the juror responded, "I have no idea. That's something you would have to, you know, it's something that could be a possibility." The juror then reaffirmed that he would not feel an obligation to explain his verdict, regardless of what it was, to anyone, including Steve Gaines. When defense counsel asked the juror whether "[y]ou feel comfortable with where you're at right now then," the juror replied,

49

"I'm fine. I just wanted to make you aware of this." Defense counsel then announced, "I have no more questions."

Defendant forfeited his challenge to the adequacy of the court's inquiry into the juror's potential bias. He did so by announcing that he had no more questions and by failing to seek a broader or more extensive inquiry. (*People v. Holloway* (2004) 33 Cal.4th 96, 126 (*Holloway*).) Defendant also forfeited his claim of error arising from the trial court's failure to discharge the juror. Defendant neither sought the juror's excusal nor objected to the trial court's handling of the issue. (*Id*. at p. 124.) But even if these claims had been preserved, we would find that they were meritless.

The decision whether to investigate the possibility of juror bias or to discharge a juror rests within the sound discretion of the trial court. (*People v. Ray* (1996) 13 Cal.4th 313, 343.) We find no abuse of discretion in the trial court's failure to inquire further into Juror No. 8's possible bias or to discharge him. (*Holloway*, *supra*, 33 Cal.4th at p. 127.) The record shows that the juror's infrequent contacts with Steve Gaines were limited to work matters and predated his jury service. The juror also pledged to avoid contact with Gaines during the trial. Although the juror expressed uncertainty when asked to predict whether a verdict that displeased Gaines might be a problem for the juror in the future, the juror was emphatic that he would not feel any obligation to justify his verdict, whatever it might be, to Gaines and that he was "fine" sitting as a juror in the case. The trial court, which was able to observe the juror's tone and demeanor, conducted an inquiry adequate to determine that Juror No. 8 could be impartial and would be unaffected by the coincidence that the victim's brother, who was not a witness in the case, worked at the juror's place of employment. (Cf. *Ray*, at p. 344 [no abuse of discretion in failing to investigate where a juror disclosed that he worked at the high school attended by the murder victim's daughter but had never

50

discussed the case with her].)  Indeed, defendant fails to identify what part of the record could have supported the juror's inability to perform " 'as a demonstrable reality.' "  (*People v. Johnson* (1993) 6 Cal.4th 1, 21.)

We also find that defendant forfeited his claim that Juror No. 8 actively concealed his work relationship with Gaines, as well as his claim that this misconduct heightened the likelihood the juror was actually biased.  Defendant failed to object at trial that the juror had engaged in misconduct or to seek the juror's discharge.  (*People v. Dykes* (2009) 46 Cal.4th 731, 808, fn. 22.)  These claims are, in any event, meritless.  The juror stated that he had only recently realized that the Steve Gaines on the witness list was the Steve Gaines who worked at Save Mart, and the juror's claim of inadvertence was bolstered by the fact that he volunteered the possible connection rather than remain silent.  (*People v. Ray*, *supra*, 13 Cal.4th at p. 344.)  An honest mistake on voir dire cannot upset a judgment in the absence of proof that the juror's wrong or incomplete answer hid actual bias, and the trial court's finding that Juror No. 8 was "especially fair," based on his sensitivity to defendant's viewpoint in answering the court's inquiries, is supported by the record here.  (See *In re Hamilton* (1999) 20 Cal.4th 273, 300.)

Finally, defendant's speculation that Gaines had supervisorial authority over the juror fails to acknowledge the juror's statement that Gaines was "not anywhere within my path to have any effect on my career at all."

I.  Cumulative Error

Defendant contends that the cumulative effect of the asserted errors requires reversal of his murder and robbery convictions, even if none of the errors is prejudicial individually.  The only error we have found involved the death-qualification of his jury, and the only error we have assumed, for purposes of

51

argument, was the failure to modify the instruction on motive.  Neither error increased the impact of the other, and their cumulative impact did not deprive defendant of a fair trial or his right to due process of law.

## IV.  PENALTY PHASE ISSUES

Because we have determined that the penalty judgment must be reversed on account of the trial court's error in the death-qualification of the jury, we need not consider defendant's other claims of penalty phase error.

## V. Disposition

The judgment of death is reversed. In all other respects, the judgment is affirmed.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Zaragoza

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S097886
**Date Filed:** July 11, 2016

_____

**Court:** Superior
**County:** San Joaquin
**Judge:** Thomas Teaford

_____

**Counsel:**

Michael R. Snedeker, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Stephanie Mitchell, Sean M. McCoy and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael R. Snedeker
Snedeker, Smith & Short
4110 SE Hawthorne Boulevard
Portland, OR  972414-5246
(503) 234-3584

Peter H. Smith
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5114