Filed 11/21/25  In re A.S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A.S.,<br><br>        Defendant and Appellant. | A171085<br><br>(Alameda County Super. Ct. No. JV-037825-01) |

After a contested jurisdictional hearing, a juvenile court found beyond a reasonable doubt that A.S. committed the felony offenses of attempted robbery and armed carjacking on two separate dates.  In this appeal, A.S. argues insufficient evidence of her identification was presented at the hearing, thus reversal is required.  We disagree.  Because substantial evidence supports the court's findings—including cell phone location data and videos recovered from A.S.'s cell phone that place her near the offenses when they occurred, in the vehicle used to commit them, and in the vehicle stolen in the carjacking—we affirm.

1

# BACKGROUND

## I. February 10, 2024 Attempted Robbery (Count 2)

After closing his convenience store in Pittsburg about 6:45 p.m. on February 10, 2024,[1] Major Singh walked to his car parked behind the store. As soon as Singh opened the door, someone "pointed the gun at [him] and told [Singh] to give them the wallet." When Singh refused, the person hit him on the head with a revolver, and Singh fell to the ground. As he fell, Singh made a lot of noise, so the person "took off" and "ran away in a car" that was "greenish" in color; nothing was taken from Singh. Singh saw only the one person who hit him with a gun and could not tell if the person was male or female because they were "covered up" and "the only thing [Singh] could see were the eyes."

Subsequently collected surveillance video of the incident taken from across the street showed a "Hyundai sedan pull up"; the driver exited the vehicle and walked across the street to Singh. After the driver "pistol-whipped" Singh, a second individual, who was visibly recognizable as female by "the body size" and "the way that [the person] look[ed]," and who spoke in what was audibly "a female voice," exited the Hyundai and talked to the driver before both returned to the vehicle and left the scene.

## II. February 15 Carjacking (Count 1)

Five days later, also around 6:00 p.m. and again in Pittsburg, Curisa Searcy and her 10-year-old daughter were driving Searcy's new Dodge Challenger SRT8 into the gated parking lot of the Mosaic Apartments when Searcy "noticed a car with the lights off" behind her. Searcy felt "weird so [she] backed up to . . . make a U-turn and go back out" of the parking lot, "but [her] car got blocked in" by the "sedan."

---

[1] All events occurred in 2024 unless stated otherwise.

2

A male exited the driver's side of the sedan, pointed a gun at Searcy, and demanded: "Give me the keys and get out of the car." Searcy's daughter began to cry, and a second person, wearing "[a]ll black" and whose "face was covered with a ski mask," stood up from the passenger side of the sedan and said, "We're sorry," and then "Let's go." The driver returned to the sedan, and the pair drove away.

Searcy believed the passenger was female because of the voice. When asked about her body type and if she was "heavyset, or thin, something like that," Searcy described the female as "tall enough to stand over the top of the car . . . not too skinny, but not big." Searcy thought the driver was Black but could not tell the passenger's ethnicity.

An hour later that same evening, February 15, Moises Rosas was leaving a park "around the corner" from his house on Harbor Street in Pittsburg. He was with his niece, nephew, and nephew's friend and had parked his black 2020 Dodge Charger R/T Hemi, license plate number 8UPL***[2] in the Hillview Middle School parking lot. As Rosas and "the kids" were "on the way out the gate [of the parking lot], a car approached" and "blocked [them] in." Two people, one bigger than the other, exited the sedan with "guns pointing" at Rosas and commanded: "Get out of the car. Lay on the ground." Rosas and the children complied, and the individuals drove away with Rosas's car. According to Rosas, one person was a male and the other smaller person "sounded like a female"; they were both "[d]ark-skinned" and wearing face masks and "[f]ull, blacked-out clothes."

At 7:45 p.m. the following day, February 16, the stolen Dodge Charger crashed through a cyclone fence in the parking lot of a Planet Fitness gym in

---

[2] Because the record does not clearly indicate if the license plate is no longer in use, we block the last three characters for privacy.

Pittsburg and left behind its license plate, number 8UPL***. Pittsburg Police Officer Joseph Berti responded to the scene and collected the license plate and the gym's time-stamped surveillance camera footage of the incident. In the video, the Dodge Charger can be seen dragging a fence "attached to the front" of the car before coming to a stop. Then, "three individuals dressed in black," including one person noticeably smaller than the others, exit the car and jump over a wall separating the parking lot from an adjacent apartment complex before the remaining driver drove away in the Charger, leaving its license plate and the broken fence.

On February 24, A.S. was arrested "while inside" the stolen Dodge Charger.

### III. Police Investigation

Prior to A.S.'s arrest, Pittsburg Police Detective Zachary Haller was assigned to the February 15 attempted carjacking and carjacking. Haller learned that one suspect—H.W.[3]—had been arrested "a couple days" after the incidents. Haller secured a search warrant for H.W.'s cell phone "call detail" records. "Looking at the times and dates of the attempted carjacking and actual carjacking," the call detail records showed that H.W.'s cell phone "was in the area of both the actual carjacking and the attempted carjacking" on February 15.

H.W.'s phone records also enabled Haller to identify the "approximate time" H.W. entered the Mosaic Apartments' parking lot on February 15. Then, through "video surveillance from the city," Haller identified "a vehicle that matched the description the victim provided": a Hyundai sedan that had

---

[3] Because H.W. was under 18 years old at the time of the offenses, we use his initials. The record does not indicate if a juvenile wardship petition was also filed naming H.W. or if related findings were made.

4

been reported to the Pittsburg Police Department as stolen on February 3. Using "License Plate Reader camera[s]" throughout Pittsburg, Haller "was able to trace that vehicle around the city" and "based on [H.W.'s] cell phone data," he was able "to see what time it crossed through a License Plate Reader camera." "[F]rom records of that license plate," Haller learned that the Hyundai sedan used in the attempted carjacking at the Mosaic Apartments was the same sedan that had been involved in the February 10 attempted robbery of Singh and in the February 15 carjacking of Rosas.

Haller secured and viewed the surveillance video of the February 10 attempted robbery of Singh that was taken "from across the street of where the robbery occurred." According to Haller, the video showed "a Hyundai sedan pull up." "The driver exited the sedan and walked across the street where the victim was walking to his car . . . there, the robbery took place . . . ." Haller could hear "a smacking sound" on the video, which he associated with Singh being pistol-whipped during the attempted robbery. Before the suspect returned to the car, "a female," which Haller could tell "by the body size . . . or the way that it looks," spoke something "inaudible . . . on the video itself." Haller "couldn't actually hear what she said -- but [he] could hear it was a female voice." The female, "said something to the suspect, and the suspect retreated back to the car and then they left the area."

Shortly after H.W.'s February arrest, A.S. visited the Pittsburg Police Department asking to talk to H.W., "her boyfriend," who "had been arrested." A.S. "was more or less distraught" and gave her cell phone number to the officer with whom she spoke, Sergeant Thompson, before leaving. Haller reviewed the body camera footage of the exchange between A.S. and Thompson and believed that A.S. "matched the physical description of the

5

female that was described during the investigation of the attempted carjacking."[4]

Haller obtained a search warrant for the cell phone records associated with the number A.S. had provided. The records showed that A.S.'s cell phone "was connecting with similar towers in similar areas as [H.W.] . . . approximately 24 minutes before the [February 10] incident" and "about an hour or so after the incident." Also, on February 15, A.S.'s "device was connecting with cell towers that were covering the area of the Mosaic Apartments where the attempted carjacking took place, as well as Hillview Junior High, where the actual carjacking took place."

At the time of A.S.'s February 24 arrest inside Rosas's stolen Dodge Charger, an officer collected her cell phone and activated "airplane mode" to preserve its contents. Haller then completed a "forensic extraction" of the data from A.S.'s cell phone that returned multiple videos pertinent to the investigation.

One video recovered showed A.S. and H.W. "walking on the street" in "the area of Harbor Street . . . around Central," which is "nearby" the area from where the Hyundai was stolen. Another recovered video taken at 9:15 p.m. on February 3, the date the Hyundai sedan was stolen, showed A.S. in the passenger seat of the Hyundai, which was identifiable by its unique "fluffy steering wheel cover, [that] was identical to the photograph that the victim had sent" Haller.

---

[4] In addition to watching Sergeant Thompson's body camera footage, by this time, Haller also "read and watched the body-worn camera of the officers that took the initial [February 15] report and the descriptions that were provided by the witnesses and victims in those cases," meaning the attempted carjacking and the carjacking.

Another video recovered from A.S.'s cell phone appears to have been taken by A.S. herself just before 10:00 p.m. on February 13. A.S. can be seen and heard as she speaks directly to the camera, pointing and gesturing with what appears to be a black gun with a visible site. A.S.'s face is in close proximity to the camera, as is her hand with a distinctive manicure holding the firearm. Haller believed the gun was "an actual firearm" based on "the barrel size."

Three more videos recovered from A.S.'s cell phone were undated but appear to have been taken at night. The first two pan across the outside of Rosas's stolen black Dodge Charger, showing the front license plate 8UPL***. In one, a male wearing black pants is speaking and a female voice recognizable as A.S. can be heard in the background. In the second, the same female voice is narrating the pan of the stolen Charger. The third video shows the lower half of a female sitting in the driver's seat of a Dodge Charger starting the car and revving the engine. She is wearing a black sweatsuit and purple sneakers, has thin legs, and the same distinctive manicure visible in the February 13 video of A.S. gesturing with a gun. The speaker's voice is again recognizable as the same voice that can be heard in the first two videos, as well as the video of A.S. with the gun.

After his initial extraction, Haller conducted a "secondary search" of the cell phone and discovered additional images in a messaging application. When Haller turned off airplane mode to download the images, the contents of the phone were "remotely wiped by Apple, which is done when the user of an iPhone puts in their user name and their password and then specifically asks Apple to remotely wipe that cell phone."

## IV. Wardship Petition and Disposition

On June 11, the Contra Costa County District Attorney filed a juvenile wardship petition against A.S. pursuant to Welfare and Institutions Code section 602, subdivision (a).[5] The petition alleged felony carjacking based on the February 15 theft of Rosas's Dodge Charger (Pen. Code, § 215; count 1); felony attempted second degree robbery based on the February 10 incident involving Singh (Pen. Code, §§ 664, 211; count 2); felony unlawfully driving or taking a vehicle based on the February 3 theft of the Hyundai sedan (Veh. Code, § 10851, subd. (a); count 3); and misdemeanor destruction of evidence for the wiping of A.S.'s cell phone (Pen. Code, § 135; count 4). The petition further alleged A.S. personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b) while committing the carjacking alleged as count 1.

At the July 1 contested jurisdictional hearing, the victims, Singh, Searcy, and Rosas, testified about the incidents;[6] none were asked to identify A.S. in court. Officer Berti testified as to his recovery of the Planet Fitness surveillance video that was played and introduced into evidence.[7] At the scene, Berti had confirmed with the gym's manager the accuracy of the

---

[5] The delinquency petition was filed and tried in Contra Costa County but was transferred to Alameda County for disposition.

[6] Prior to Rosas testifying, Pittsburg Police Officer Alicia Martinez, who had responded to his carjacking report, testified that "[o]ne of the victims stated that they had seen a dark gray Kia," but that testimony was stricken after objection from defense counsel. However, during his cross-examination of Rosas, defense counsel called the car a Kia in his questions, and no objection was made. No further testimony concerning a Kia appears in the hearing transcript.

[7] The Planet Fitness surveillance video was introduced into evidence as exhibit 1.

8

video's timestamp of 7:45 p.m. on February 16 and "collected [the] license plate," which was "inputted . . . in the Pittsburg Police Department evidence."

Detective Haller testified about his investigation and the technology used to track the location of A.S.'s and H.W.'s cell phones.[8] Haller also described the surveillance video of the February 10 attempted robbery, the two videos recovered from A.S.'s cell phone that were taken on February 3 and showed A.S. and H.W. walking on Harbor Street and A.S. in the passenger seat of the stolen Hyundai, and the photograph of the stolen Hyundai and its distinctive "fluffy" steering wheel cover given to Haller by the car's owner.[9]

Through Haller, the People also introduced into evidence the videos of the stolen Dodge Charger and the firearm extracted from A.S.'s cell phone.[10] The People did not introduce any testimony or evidence detailing the taking of the Hyundai sedan, nor did they argue for a finding specific to the related count 3.

---

[8] The "raw data" provided by A.S.'s cell phone company was introduced into evidence as exhibit 2. According to Haller, the call detail records include, "anytime you make a phone call, a text . . . as well as cell phone data records, which is any time a phone accesses the web. It could be for . . . Google Maps or checking your email, for example . . . those data points, times, are collected. [¶] And then there is other information called timing advance records, or PRTT, in which case cell phone companies monitor . . . how well cell phones are connected to towers for their own personal quality control . . . practices."

[9] These videos and the photograph were not introduced into evidence.

[10] Exhibit 3 is narrated by the male as he walks around the Charger; the female speaks at the end. Exhibit 5 is narrated by the female walking around the Charger. Exhibit 4 is the video of the female dressed in black sweatpants starting the Charger. Exhibit 6 is the video of A.S. rapping and gesturing with the firearm.

After closing argument, the jurisdictional hearing court found true the February 15 carjacking allegation and associated firearm enhancement (count 1), as well as the February 10 attempted robbery allegation (count 2). The court explained the "identification of [A.S.] as the female involved in [the carjacking] was adequately established by a lot of circumstantial evidence," including the videos from A.S.'s cell phone, which the court described as "certainly the most damning evidence that was provided." The court also considered the location of A.S.'s cell phone, which "was in the area of these different events connecting her with [H.W.], whose phone was also connected to these incidents." Moreover, the video from A.S.'s cell phone, "captured just a couple days" before the carjacking, "depicting a real gun . . . further establishes the requirement" for the firearm enhancement. The court also found the attempted robbery allegation true beyond a reasonable doubt "based on the detective's testimony," "the cell phone evidence, the surveillance footage, and the totality of the evidence."

The court found insufficient evidence to prove count 3, the unlawful taking of the Hyundai because, even though it was "more likely than not that [A.S.] was involved in that particular theft," a violation of Vehicle Code section "10851 requires that the People establish that the owner of the vehicle did not give the minor consent to be in possession of it, the -- and while that would have, no doubt, been possible, it was not provided to the Court." Additionally, in the video to which Haller testified, A.S. "was in the passenger's seat," not the driver's seat.

The court also declined to make a true finding as to count 4, the destruction of the cell phone evidence because, although it was "certainly more likely than not that either [A.S.], or her mother" wiped the cell phone, the court found "insufficient evidence to prove" beyond a reasonable doubt

10

"that [A.S.] was the only person who had . . . the information required in order to wipe the data from the phone."

After being transferred to Alameda County for disposition, the court placed A.S. on probation for 112 months.  A.S. appealed the findings of the jurisdictional hearing court.[11]

## DISCUSSION

In this appeal, A.S. does not dispute that "an attempted robbery was committed against [Singh] and that two people committed the offense," nor does she dispute sufficient evidence was presented to prove a carjacking took place and that a gun was used.  Instead, A.S. argues there was "insufficient" evidence "to prove beyond a reasonable doubt that [she] was the female suspect" involved in the attempted robbery and carjacking.  In particular, she challenges Haller's "observation" of a female in the attempted robbery surveillance video, arguing that "no evidence was presented to clarify what Haller considers a 'female body size' " or "to support Haller's claim that he heard a female voice."  A.S. also complains the video of her "displaying a firearm" and the non-specific eyewitness descriptions of the female and the weapon used in the carjacking were insufficient to establish that she "committed the offense."  She further asserts, "cell phone tower technology is imprecise and can only indicate a general area, not a specific location."  A.S. claims her "relationship with [H.W.] provides a plausible reason for her

---

[11] A.S. filed a premature notice of appeal after the conclusion of the contested jurisdictional hearing, which we deemed timely filed upon issuance of the dispositional order.  The transfer and terms of A.S.'s disposition are not being challenged in this appeal.

11

presence in the videos and photos taken with him but does not prove beyond a reasonable doubt that" she was the second suspect.[12]

We disagree. Considering the evidentiary record "in the light most favorable to the judgment" with "all reasonable inferences" drawn in favor thereof, we conclude substantial evidence supports the juvenile court's finding that A.S. committed both offenses and used a firearm during the carjacking. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*); *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581 (*Schmidt*).)

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Rodriguez, supra*, 20 Cal.4th at p. 11; see also *In re V.V.* (2011) 51 Cal.4th 1020, 1026 [review of a juvenile's "substantial evidence claim is governed by the same standard applicable to adult criminal cases"].) The question is not "whether the reviewing court itself believes the evidence at trial establishes guilt

---

[12] Acknowledging "comparisons with other cases have limited usefulness" when reviewing a record for substantial evidence, A.S. "[n]evertheless" urges us to follow "the analysis undertaken" in *People v. Blakeslee* (1969) 2 Cal.App.3d 831 (*Blakeslee*), where the Court of Appeal reversed the conviction because there was no murder weapon found or any evidence "linking the defendant in some manner to a weapon." (*Id.* at p. 840.) The Court of Appeal concluded the defendant had used a false alibi not because she was guilty but "to protect her brother," who could "almost equally" have been the "protagonist." (*Id.* at pp. 838, 840.)

But here, as discussed, there is dramatically more evidence associating A.S. with the charged crimes than in *Blakeslee*, including cell phone data placing her in the area of the offenses and multiple videos showing her in the stolen vehicles and brandishing a firearm. Therefore, we agree with A.S. that *Blakeslee* is of "limited usefulness."

beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Rodriguez*, at p. 11.)

In applying the substantial evidence standard of review, we accept all evidence in support of the juvenile court's judgement; "we completely disregard contrary evidence," and "we draw all reasonable inferences to affirm the [juvenile] court." (*Schmidt*, *supra*, 44 Cal.App.5th at p. 581.) In short, "We do not reweigh the evidence." (*Ibid.*)

Moreover, "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 125–126.) " '[C]ircumstantial evidence may be sufficient to connect a defendant with the crime and to prove [their] guilt beyond a reasonable doubt.' " (*People v. Bean* (1988) 46 Cal.3d 919, 933, quoting *People v. Pierce* (1979) 24 Cal.3d 199, 210; see also *People v. Manibusan* (2013) 58 Cal.4th 40, 87 [" 'circumstantial evidence is as sufficient as direct evidence to support a conviction' "]; accord, *People v. Campbell* (2020) 51 Cal.App.5th 463, 484.) "Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, . . . and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other." (CALCRIM No. 223; see also *People v. Livingston* (2012) 53 Cal.4th 1145, 1166 [CALCRIM No. 223 " 'correctly state[s] the law regarding direct and circumstantial evidence' "].)

With these standards in mind, we consider the evidence presented at the jurisdictional hearing. On February 3, a Hyundai sedan with a fluffy steering wheel cover was stolen from "the area of Harbor Street . . . around Central" in the city of Pittsburg, and video retrieved from A.S.'s cell phone

13

shows H.W. and A.S. walking together nearby on the same date. A second video recorded at 9:15 p.m. on February 3, shows A.S. seated in the passenger seat of a Hyundai with a fluffy steering wheel cover, "which was identical to the photograph that the victim had sent [Haller]."

The following week, on February 10, Singh was pistol-whipped and almost robbed in the parking lot outside his convenience store, also located in Pittsburg. Surveillance video shows two people were involved, a male and a female; the female was identifiable by her "body size" and her "voice." The pair used the stolen Hyundai, visible in the surveillance video, to commit the offense.

Three days later, on February 13, A.S. filmed herself in a close-up video, talking and rapping while holding "an actual firearm," black in color with an active site. As she gestures with the weapon, her distinctive manicure is visible.

Then, on February 15, a male and a female driving the same stolen Hyundai sedan used in the Singh offense attempted to steal Searcy's new Dodge Challenger from the Mosaic Apartment complex, again in Pittsburg. The male said, "Give me the keys and get out of the car" and pointed a gun at Searcy and her daughter. When Searcy's daughter started crying, the female "stood out of the passenger's side" and said, "We're sorry. Let's go." She was dressed in "[a]ll black" clothing with her face covered by a "ski mask," but was recognizable as a female by her voice. Searcy also noted the female was "not too skinny, but not big."

Later that same evening, Rosas was with his family at a Pittsburg park "around the corner" from his residence on Harbor Street—the same street from where the Hyundai had been stolen—when a male and female, also wearing "[f]ull, blacked-out clothes" with their "whole face" covered, exited

14

the stolen Hyundai sedan with guns drawn and said, "Get out the car. Lay on the ground." Like Searcy, Rosas testified that the smaller assailant "sounded like a female."

As such, witness testimony tells us that within a two-week period, a male and female dressed in black with face masks used a stolen Hyundai sedan to commit three theft-based offenses within the city of Pittsburg—at least two of which were around the area of Harbor Street. We know that A.S. was on Harbor Street with H.W. the day the Hyundai sedan was stolen and that she was seen on video inside the sedan that night, after the car's theft. And, A.S. was arrested in the Dodge Charger that was stolen from Rosas roughly a week after the carjacking. In itself, this testimony is substantial evidence that A.S. was involved in the robbery and carjacking; it is then further corroborated by location data and the videos extracted from A.S.'s cell phone.

Indeed, cell phone location data demonstrates A.S. was at least in Pittsburg, if not in the general vicinity of all three offenses (and was seemingly with or near H.W.), when the offenses occurred. The fact that A.S.'s phone does not appear to have been transmitting data during the commission of the Singh offense is not evidence that A.S. was not involved, rather, in view of the wiping of A.S.'s cell phone after her arrest, it could be reasonably inferred that A.S. intentionally turned off her phone's data transmission during the offense. (See *People v. Holloway* (2004) 33 Cal.4th 96, 142 ["The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense"]; see also CALCRIM No. 371 ["If the defendant tried to hide evidence . . . that conduct may show that [she] was aware of [her] guilt"].)

15

Additionally, A.S. was not only arrested in Rosas's Charger, but videos recovered from her own cell phone show a male and a female each talking and walking around the stolen Charger no more than 24 hours after its theft.[13]  Another recovered video shows a female starting and revving the engine of a Dodge Charger; she is wearing a black sweatsuit with the same distinctive manicure A.S. wears while handling a firearm in exhibit 6.  The voice of the female heard on all three Charger videos matches the voice of A.S. that is heard clearly rapping on exhibit 6, the video she self-recorded two days earlier.

At the jurisdictional hearing, Haller identified A.S. in the courtroom as the "thin female adult" he observed in the videos that he reviewed as part of his investigation.  In making his identification, Haller relied upon his observations of A.S. from Thompson's body camera when she visited the police station looking for H.W. after his arrest and her video selfie with a gun on February 13, which also matched the descriptions given of the female involved in the February 15 carjacking and attempted carjacking.

Therefore, the video evidence, corroborated by Haller's observations, unambiguously connects A.S. to each of the stolen vehicles.  As such, it was reasonable for the hearing court to infer that the female seen on Harbor Street and in the stolen Hyundai the day it was stolen, in a video holding a gun two days before the armed carjacking of Rosas, and outside and in the passenger seat of the Dodge Charger shortly after it was stolen was the same

---

[13] Although no specific timestamp was testified to at the jurisdictional hearing, these videos, which were visibly taken at night and show the Charger's undamaged front end and license plate, must have been filmed after the 7:00 p.m. carjacking on February 15 and prior to 7:45 p.m. on February 16, when the Dodge Charger was recorded in a time-stamped surveillance video crashing through the cyclone fence of the Planet Fitness and leaving behind its license plate.

female dressed in black visible in the surveillance video of the Singh robbery and described by Searcy and Rosas. (Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action"].)

A.S. overlooks the totality of this evidence presented and instead complains about the sufficiency of her personal identification, further arguing that the cell tower data is not sufficiently specific to overcome the identification inadequacies.[14] But, as stated, the cell phone location testimony was not the only evidence presented in this case, which details a string of similar criminal offenses in the city of Pittsburg (some on or near the same street) within a two-week period committed by a male and female dressed in black with their faces covered, and it is video evidence from A.S.'s own cell phone that connects her to the Hyundai used to commit the offenses and the Dodge Charger the male and female stole. It is in that context that the cell tower data further confirms A.S. was with H.W. at the approximate time of and in the area of the charged offenses, two circumstances that further weigh in favor of the jurisdictional hearing court's findings.

Likewise, A.S.'s suggestion that her relationship with H.W. may provide alternative explanations "for her presence in [the] videos and photos"

---

[14] A.S. also contends that this evidence is insufficient because "eyewitness testimony established that the suspect vehicle in the carjacking was a dark gray Kia, not the Hyundai identified by Haller." But this argument is based on stricken testimony from the jurisdictional hearing. Although the Kia reference was incorporated into subsequent questioning without objection, A.S. still cannot use it as a basis for reversal because "we completely disregard contrary evidence" in reviewing for substantial evidence. (*Schmidt, supra*, 44 Cal.App.5th at p. 581.)

17

is unavailing. First, the fact " ' "that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean, supra*, 46 Cal.3d at p. 933; *People v. Brooks* (2017) 3 Cal.5th 1, 58 ["Although the scenario defendant describes appears plausible, this court's role on review does not involve a reevaluation of the evidence"].)

Second, when considering circumstantial evidence, a trier of fact is required to "accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224; *People v. Livingston, supra*, 53 Cal.4th at p. 1166.) A.S. specifically argues that her "relationship with [H.W.] provides a plausible reason for her presence" with him in the stolen cars and the jurisdictional court's findings "ignore the plausible possibility that [H.W.] associated with other female friends, relatives, or crime associates." But this argument asks us to speculate about possible evidence that was never presented. At the jurisdictional hearing, A.S. did not introduce evidence of an alibi or of other women close to H.W. that physically match her description and were in Pittsburg and in the area of Harbor Street around the time of the offenses.[15] To reject the reasonable inferences establishing A.S.'s identity as the assailant that were made by the trial court after review of the evidence in favor of speculation without evidentiary basis would be inconsistent with the law and the record before us. (*People v. Barnes* (1986) 42 Cal.3d 284, 306 [to reject evidence that " ' "has been believed by the [trier of fact], there must

---

[15] A.S.'s relationship argument seems to concede that H.W. was the male involved in the charged offenses and was the male seen or heard in the different videos introduced into evidence. No evidence of true findings as to H.W. were presented at A.S.'s jurisdictional hearing; thus, we do not presume that H.W. was the involved male coparticipant and assess the hearing court's finding as to A.S. independently.

exist either a physical impossibility that [the evidence is] true, or [the] falsity must be apparent without resorting to inference or deductions" ' "].) We therefore remain unpersuaded.

Turning to the firearm use enhancement for the February 15 carjacking (count 1), Rosas testified that both suspects, the male and the female, pointed guns at him during the crime, which, as the juvenile court noted, is "all that is required for the enhancement," "that [an] individual personally used a firearm, displaying the weapon in a menacing manner." In attributing the use of a firearm to A.S., the court explained, the February 13 video of A.S. "displaying a firearm while talking about it" "was certainly the most damning evidence" presented. If substantial evidence supports the juvenile court's findings that A.S. committed the February 10 attempted robbery and the February 15 carjacking, and the hearing court believed Haller's testimony that the gun A.S. was holding in exhibit 6 was a real firearm, then there is sufficient evidence to support the hearing court's finding that when A.S. committed the February 15 carjacking two days later she personally used a weapon. (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059; see also *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436–1437 ["Circumstantial evidence alone is sufficient to support a finding that an object used by a robber [is] a firearm"].)

The dissent builds upon A.S.'s arguments on appeal and would reverse for insufficient evidence, stating this case "depended on identifying A.S. as one of the perpetrators." We respectfully disagree with the characterization of this case as one based on identification rather than a case based on circumstantial evidence, which it unquestionably was.

Where "the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts" (*People v. Zaragoza* (2016)

19

1 Cal.5th 21, 44), and our review is circumscribed by the trier of fact's " 'wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony' " and then " ' " 'combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.' " ' " (*People v. Collins* (2025) 17 Cal.5th 293, 335 (dis. opn. of Guerrero, C.J.).) The dissent discredits Haller's investigation and picks apart the limited descriptions of the masked assailants testified to by the victims, complaining that no witness was asked to identify A.S. and their descriptions could include "virtually any average size woman."

But, as a matter of law, " 'the identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing.' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522.) And, " 'An appellate court cannot substitute its judgment for that of the trial court on the facts unless the testimony as to a particular fact "in the light of the undisputed facts, is so inherently improbable and impossible of belief as in effect to constitute no evidence at all." [Citations].' " (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.)

Here, we cannot say that any of the evidence presented—that is, the civilian and police testimony and the videos introduced—is inherently false or impossible. The reason why no victim was asked to identify A.S. is obvious: they stated that they were unable to see the faces of the assailants because they wore masks (and Singh did not see the involved female at all). That said, the descriptions given by Searcy and Rosas, while limited, were based on their personal observations of the suspects, which led to their independent conclusions that one suspect was male and the smaller suspect was female, as evident by her voice and physical appearance. (See *People v. Lindsay*

20

(1964) 227 Cal.App.2d 482, 493–494 ["Our courts have held that it is not necessary that any of the witnesses called to identify the accused should have seen [her] face"].)

Our job on review is not to critique those descriptions in isolation, but rather we must assess the sufficiency of the totality of the evidence presented. (*People v. Zaragoza*, *supra*, 1 Cal.5th at p. 44 ["Even where, as here, the evidence of guilt is largely circumstantial, our task is not . . . to inquire whether the evidence might reasonably be reconciled with the defendant's innocence"].) In fact, "where the prosecution relies on circumstantial evidence," our role on appeal is "especially limited." (*People v. Collins*, *supra*, 17 Cal.5th at p. 334 (dis. opn. of Guerrero, C.J.) ["In a potentially close case, it is all the more important to faithfully apply the standard of review"].)

Having confirmed our role within the applicable standard of review, we must view the witness descriptions of A.S. as a "a thin female adult," who was smaller than a man but tall enough to stand over a sedan and "not too skinny, but not big" in light most favorable to the judgment. Further, in addition to observing Haller's in-court identification of A.S.,[16] the court was also able to view A.S. in person and compare her appearance to that in the

---

[16] The dissent considers Haller's courtroom identification limited to "her as being the person who showed up at the police station to ask about her boyfriend, as depicted on the body camera footage of another police officer." (Dis. opn., *post*, at p. 11.) However, this limitation overlooks the exchange preceding the in-court identification, which included Haller's description—in response to a "foundation" objection—of the materials he had reviewed prior to observing the footage of A.S.'s visit to the police station: "I reviewed -- at this point in the investigation, I reviewed the body-worn camera of Sergeant Thompson, when he made contact with [A.S.], . . . I also read and watched the body-worn camera of the officers that took the initial report and the descriptions that were provided by the witnesses and victims in those cases."

unchallenged video of A.S. gesturing with a gun, the video of a thin female dressed in a black sweatsuit with the same voice and manicure as A.S. revving the engine of the stolen Charger, and the video of the three figures in black jumping a wall after fleeing the Charger that had crashed through the gym fence. (*People v. Leon* (2015) 61 Cal.4th 569, 601 ["because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant"].) To the extent the witness descriptions were generic, the court was free to disbelieve them, but we cannot say they were incredible or lacked solid value. (See *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 [the fact that dependency court "could have assessed [a witness's] credibility less favorably or that our court could reasonably make a different assessment of credibility is not sufficient grounds for reversal"]; Evid. Code, § 412.) To hold differently would be to suggest that criminal convictions or juvenile findings could only be made in cases where there is a direct physical identification by an independent witness. But that is not the law. (*People v. Zaragoza*, *supra*, 1 Cal.5th at p. 45 ["The evidence that defendant was the shooter was entirely circumstantial—but it was sufficiently substantial to uphold his convictions"]; see also CALCRIM No. 223 ["Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge . . . and neither is necessarily more reliable than the other"].)

The dissent goes on to complain that, rather than bolster the identification of A.S., the cell phone location data means "precious little, according to Haller." It specifically notes that " 'there is no data or records' " of A.S.'s cell phone at the time of the February 10 incident. But these characterizations are inconsistent with Haller's testimony that "the cell phone data only provides confirmation of what I suspect to be there. It

doesn't actually pinpoint this person at that location or that person at this location. It's the totality of the evidence that I have collected."

Further, when viewing the evidence in light most favorable to the judgment, as the law requires us to do, the fact that A.S.'s cell phone was transmitting before the attempted robbery and again after the attempted robbery but not at all for roughly 90 minutes during the commission of the crime creates an inference of guilt more incriminating than exculpatory. And while it is true that the cell phone data could not "pinpoint" the location of A.S. during each of the offenses, it did establish that A.S. was in close proximity to H.W. and in the city of Pittsburg before and after the February 10 and February 15 offenses. That is circumstantial evidence in support of the court's findings. In fact, the juvenile court agreed that Haller "provide[d] a sufficient explanation for the Court to explain why it was not just the azimuth information, but a totality of information that established that [A.S.'s] phone was in the area of these different events . . . ." Thus, we respectfully disagree with the dissent's criticisms, which go to the evidence's weight and are beyond the scope of our review. (*People v. Davis* (2024) 107 Cal.App.5th 500, 511 [" ' "[E]ven testimony [that] is subject to justifiable suspicion do[es] not justify the reversal of a judgment" ' "].)

In sum, we believe a factfinder could—and the juvenile hearing court did—reasonably conclude that A.S. was the female involved in the attempted robbery and carjacking based on the circumstantial evidence presented and reasonable inferences drawn therefrom, and we are bound by that finding under the substantial evidence standard of review. (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 752 ["On this record, we cannot say the inferences the trial court drew were unreasonable, and this precludes us from overturning the court's determination"].)

23

## DISPOSITION

The judgment is affirmed.

DESAUTELS, J.

I concur:

STEWART, P. J.

*In re A.S.* (A171085)

A171085 - *People v. A.S.*

MILLER, J., Dissenting

A.S. contends there was insufficient evidence to sustain the juvenile court's findings that she committed attempted robbery and carjacking and used a firearm in connection with the carjacking. Our task on appeal is to review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence such that a reasonable trier of fact could find A.S. guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*); *In re V.V.* (2011) 51 Cal.4th 1020, 1026 [a minor's substantial evidence claim is reviewed under the standard governing adult criminal cases].) "Substantial evidence is ' "evidence that 'reasonably inspires confidence and is of "solid value." ' " ' " (*People v. Collins* (2025) 17 Cal.5th 293, 307.) Keeping that well-established standard in mind, I scoured the entire 103 page hearing transcript and reviewed all of the exhibits. Try as I have to find substantial evidence—meaning evidence that is "reasonable, credible, and of solid value"—to affirm the trial court's findings that A.S. committed felony offenses, I simply cannot. (*Rodriguez, supra,* 20 Cal.4th at p. 11.) With all respect to my colleagues, I conclude that no reasonable trier of fact could find A.S. guilty on this record. No one has ever identified A.S. as one of the two perpetrators of the attempted robbery or carjacking, and the remaining evidence does not reasonably inspire confidence that she was. For this reason, I dissent.

This is the evidence in the light most favorable to the prosecution's case and the judgment.

On February 3, 2024, a Hyundai sedan with a "fluffy cover" on the steering wheel was reported stolen.

1

On the evening of February 10, at about 6:45 p.m., Mr. Singh, a convenience store owner, closed up his store and was getting into his car when someone pointed a gun at him and told him to hand over his wallet. When he refused, someone hit Mr. Singh on the head with the gun. The person ran away in a "greenish" car. Mr. Singh could not describe the person at all, let alone whether the person was male or female, because the person was "covered up" and the only thing he could see were the eyes. He was not asked to nor did he ever identify A.S. as the perpetrator at trial.

The police recovered a video from a surveillance camera across the street showing the attempted robbery of Mr. Singh. Zachary Haller, a City of Pittsburg police detective, testified about the video, although it was not shown to the court or put in evidence. Haller said the surveillance video showed a "Hyundai sedan" pulling up and the driver walking across the street where Mr. Singh had said he was walking to the car. Haller heard a "smacking sound" on the video and then, "before the suspect returned to the car, *a female, which I can tell by the body size, um—or the way that it looks*, and then she spoke, which was inaudible, um on the video itself." Haller "couldn't actually hear what she said—but . . . could hear it was a female voice—um, said something to the suspect, and the suspect retreated back to the car and then they left the area." (Italics added.)

On February 15, in the evening, Ms. Searcy and her daughter were the victims of an attempted carjacking in the parking lot of the Mosaic Apartments in Pittsburgh when Ms. Searcy's car was "blocked in" by a "sedan." A male exited the driver's side and pointed a gun at her; a second person, wearing all black and whose face was covered with a "ski mask" "stood up" out of the passenger's side of the car, said "[w]e're sorry" and "[l]et's go." The two suspects drove off in the sedan. Ms. Searcy testified she

2

"*assumed it was a female because of her voice. Um, the face was covered with a ski mask, so I don't know*." (Italics added.) But she could not describe anything about the female: "[s]he never came out of—towards the car. She only stood out of the passenger's side to say, "Lets go." She could not see her "ethnicity." When asked if she could describe the suspect's "body type," Ms. Searcy replied, "*Um, tall enough to stand over the top of the car but, um, I couldn't really tell. It was dark; um, not too skinny, but not big*." (Italics added.) The suspect was wearing "all black." Ms. Searcy was not asked to nor did she ever identify A.S. at trial. A.S. was not charged with this attempted carjacking.

Later in the evening on February 15, at about 7:45 p.m., Mr. Rosas was the victim of a carjacking at the Hillview Middle School parking lot in Pittsburg. He was driving a black Dodge Charger (license plate 8UPL*** (redacted for privacy)) when another vehicle approached, blocked him in, and two people got out of a Kia with guns pointed at him. They told him to get out of the car and lie on the ground. It was dark and he could not see what the individuals looked like: they had "*face mask covers*" on their entire face, and "[f]ull, blacked-out clothes." (Italics added.) He thought their ethnicity might have been "dark skinned." One was male, and "*one sounded like a female*." (Italics added.) He could not describe anything about the guns. He was not asked to nor did he ever identify A.S. at trial. And there was no surveillance video from this incident.

On February 20, a Pittsburg police officer, Joseph Berti, responded to a report from Planet Fitness that a black Dodge Charger hit a fence in the gym's parking lot in Pittsburg and drove off, leaving behind a license plate. Officer Berti recovered license plate 8UPL*** at the scene and collected Planet Fitness surveillance camera footage from the evening of February 16,

3

which was played at trial. Officer Berti testified that the footage showed when the Dodge Charger came to a stop, "three people exit[ed] the vehicle and they proceeded to go over [a] solid wall." When he was pressed whether he was able to see in the surveillance footage "detail of the individuals that escaped the car," he responded, "I could see *three individuals with black clothing and I wasn't able to identify anything else*." (Italics added.) That was it.

On some unspecified date after these events, A.S. went to the Pittsburg police station, looking for her boyfriend H.W. who she said had been arrested. A.S. left her cellphone number with an officer at the station. This information somehow came to the attention of Detective Haller. He had been investigating the carjacking and the attempted carjacking, and learned that H.W "was arrested, um, in an area close to the attempted carjacking. Um, and in addition to that, he was, um alleged or believed to be possibly, um, tampering with a car in the area that was similar to a car of the description of the—used in the attempted carjacking and the actual carjacking." After a hearsay objection, the district attorney responded that the testimony "isn't for the truth of the matter asserted, just the effect on the listener at a subsequent investigation." And so the court agreed to "accept . . . the last answer in that regard only." Haller testified about H.W.'s call records, but there was no evidence that H.W. was ever charged with, or convicted of, any crime.

Haller had no interaction with A.S. when she appeared at the police station, but he reviewed the body-worn camera footage from the officer who had spoken to her, which was not offered in evidence. Haller testified she "matched the physical description of the female that was described" in the investigation of the attempted carjacking and the actual carjacking, which as

4

we have seen was a presumed female (by the voice) and, as the victim of the attempted car jacking described, *"tall enough to stand over the top of the car but, um, I couldn't really tell. It was dark; um, not too skinny, but not big."* (Italics added.) Haller requested a search warrant for A.S.'s cell phone records.

Using a license plate reader and information from unspecified "video surveillance from the city," Haller testified that the license plate on the Hyundai reported stolen on February 3 matched the license plate on the car used in the attempted robbery of the convenience store owner on February 10.[1]

Haller testified about the cell phone tower data for A.S.'s and H.W.'s cell phones. Incident by incident, this is what he learned. For the attempted robbery on February 10, he could see that A.S.'s phone "was connecting with similar towers in similar areas as [H.W.] before the incident, approximately 24 minutes before the incident, um, and then about—um, if memory serves, about an hour or so after the incident." But *"specifically, at the time of the robbery on February 10th, um, there is no data or records, or anything like that, of [A.S.]'s cell phone at that time."* (Italics added.)

For the two incidents on February 15, he was able to determine "[A.S.]'s device was connecting with cell towers that were covering the area of the Mosaic Apartments where the attempted carjacking took place, as well as Hillview Junior High, where the actual carjacking took place."

---

[1] It is unclear how Haller reached this conclusion or the basis for his testimony. The surveillance video of the attempted robbery itself was not introduced in evidence, and when Haller described that video he did not testify that that the license plate of the Hyundai was visible in the surveillance video itself.

But what did that cell phone data mean?  In this case, precious little, according to Haller.  "Well, in totality of all of the other evidence that I had collected up at that point, the cell phone data only provides confirmation of what I suspect to be there.  *It doesn't actually pinpoint this person at that location or that person at this location.*  It's the totality of the evidence that I have collected."[2]  (Italics added.)

And what about the totality of the evidence?  The police department extracted videos from A.S.'s cell phone, four of which were admitted in evidence and the subject of Detective Haller's testimony.

Three videos (Exhibits 3, 4 and 5) are undated and they relate to the carjacked Dodge Charger.  Exhibit 3 shows license plate 8UPL\*\*\* (the carjacked Dodge Charger).  Exhibit 4 shows a steering wheel that  "look[s] similar" to the steering wheel in Exhibit 3, and Haller testified that the voice on Exhibit 4 sounds like "a male voice."  Exhibit 5 is a "very fuzzy, not much detail" video and "it's not very clear what exactly it is that I am seeing."  But the audio sounds like "a female voice" and "even through the screen distortion" the license plate looks like "8UPL\*\*\*" (the carjacked Dodge Charger).  There is no evidence when these videos of the Dodge Charger were made in relation to the February 15 carjacking.  And no evidence of when or where A.S. got into the Dodge Charger shown in these exhibits.

Exhibit 6 is a video of A.S., extracted from her cell phone, holding what Haller testified "appears to be a firearm," based on "the barrel size."  The

---

[2] Haller admitted that the cell phone tower for the area of Hillview Middle School was "right in the middle of Pittsburg" and covers a "great deal more area in Pittsburg" than just the site of the carjacking, and he couldn't "recall offhand what specifically that tower covers" and whether it was a distance measured in square miles.

metadata shows Exhibit 6 was taken on February 13, three days after the attempted robbery of Mr. Singh and two days before the carjacking.

Haller described two other videos he had seen on A.S.'s cell phone "to suggest that [A.S.] was nearby the stolen Hyundai." There was a video "that showed her to be in the area of Harbor Street, um, around Central, um, which I know just from being in the area." In the video, A.S. and H.W. were "walking on the street." There was no testimony about when this video was taken or the significance of this "area of Harbor Street" to any fact in evidence about the case. And there was a video taken on February 3 showing A.S. seated in the passenger seat of "the vehicle" "based on this fluffy steering wheel cover."

A.S. was arrested in the passenger seat of the Dodge Charger; Haller did not recall the date, but thought it was February 24. After A.S. was arrested her cell phone was taken from her, placed in airplane mode, and not returned to her.

Viewing the entire record, what does the evidence actually prove? In my view, it does not contain substantial evidence sufficient for a reasonable trier of fact to find A.S. guilty of the crimes charged beyond a reasonable doubt.

As to the attempted robbery (count 2), the evidence shows that one week before the attempted robbery of Mr. Singh, there is a video of A.S. sitting in the passenger seat of a Hyundai with a distinctive fluffy steering wheel cover that was reportedly stolen.[3]

---

[3] The juvenile court found insufficient evidence that A.S. had driven or taken that vehicle without consent (Veh. Code, § 10851) and she was acquitted of count 3.

7

The Hyundai was apparently connected to the attempted robbery of Mr. Singh one week later. But the victim provided no description of the perpetrator of the attempted robbery and it is undisputed that the video is not good enough quality to identify *who* was in the Hyundai or who got out of it and attempted to rob Mr. Singh. The most Detective Haller could say upon viewing the surveillance footage was that he could tell a female was involved "by the body size, um—or the way that it looks" and a female voice that was "inaudible on the video itself." That amounts to no description at all. The details were critical, since the surveillance video was not offered in evidence. The remaining evidence connecting A.S. to the crime is cell phone data, which places A.S. in unknown proximity to the scene and unknown proximity to H.W. somewhere in Pittsburg 24 minutes before the attempted robbery, and then again beginning about an hour after the incident—but not during the attempted robbery itself. That A.S. was in Pittsburg and near H.W. is not surprising, since H.W. was her boyfriend and A.S. lived in Pittsburg, two plausible reasons for her cell phone connecting to towers. But *"specifically, at the time of the robbery, on February 10th, um, there is no data or records, or anything like that, of [A.S.]'s cell phone at that time."* (Italics added.) All that reasonably can be inferred from this evidence is that A.S. and H.W. were near each other (but no one can say how near) before and after the attempted robbery.[4]

---

[4] Haller explained that cell phones generally connect to the closest tower to the cell phone, "but in many instances, um, it may connect to a different tower that covers a greater area. [¶] And, in some cases, there could be some significant outliers where data reflects that the cell phone is actually connecting with different towers that are not consistent with other towers at the same time that the cell phone is also connecting with."

In short, the evidence reasonably shows the following. At some point, A.S. was in the stolen Hyundai used to commit the attempted robbery; shortly before and after the attempted robbery, A.S. was in the general vicinity of her boyfriend; she matched the characteristics of one of the perpetrators to the extent that one of the perpetrators appeared in the surveillance video to be female; and she posed for a video with a firearm three days after the attempted robbery. In my view, this is not sufficient evidence for a reasonable trier of fact to find beyond a reasonable doubt that A.S. committed the attempted robbery.

The juvenile court also found A.S. committed the carjacking of the Dodge Charger (Count 1). Substantial evidence does not support this finding, either. It was dark, the suspects had "face mask covers" on their entire face, and "[f]ull, blacked-out clothes." All that Mr. Rosas, the car jacking victim, could say is that one perpetrator "sounded like a female." He could not describe anything at all about the guns pointed at him. Nor was he asked whether the gun shown in the video of A.S. found on her cell phone was like the one used in the car jacking. The cell phone data suffers from the same infirmity. In and of itself, it was too imprecise and unreliable to prove that A.S. was actually at the scene of the carjacking in the Hillview Middle School parking lot; all we know from Detective Haller's testimony is that her phone was pinging a cell tower that covered an area of unspecified size (Haller could not say whether a single tower's coverage encompassed multiple square miles) that included the parking lot. And although undated videos (Exhibits 3, 4, 5) connect A.S. to the Dodge Charger on some unknown date and time after the incident on February 15, and there was evidence she was arrested in the Dodge Charger on February 23, where the victim cannot identify A.S. at all, her connection to the Dodge Charger is not sufficient substantial

9

evidence to support a finding that she committed a carjacking on February 15.

Although A.S. was not charged with the attempted carjacking earlier in the day at the Mosaic Apartments, the People presented testimony about it, likely because that was the most detailed description of the female suspect who was the subject of A.S.'s trial: a person wearing "all black" who was *tall enough to stand over the top of the car but, um, I couldn't really tell. It was dark; um, not too skinny, but not big*." In any event, being tall enough to stand over the top of a car (a Hyundai sedan?) and not too skinny, but not big is a description that could describe virtually *any* average size woman.[5]

This is a case that depended on identifying A.S. as one of the perpetrators. None of the eyewitnesses could provide a description of this perpetrator beyond the possibility that the person was female based on the voice and body size, and it was undisputed there was no surveillance videotape of a quality where a viewer could identify the perpetrators of the incidents. Haller's physical description of the perpetrator from watching the surveillance tape of the attempted robbery was that it was a female "which I can tell by the body size, um—or the way that it looks." Haller identified A.S.

---

[5] Bolstering the "not too skinny, but not big" description from the attempted carjacking, the majority adds its own description of what it sees in Exhibit 4 (the video from A.S.'s phone showing someone in the driver's seat of a Dodge Charger), beyond what Haller testified or counsel argued at trial. The majority opinion says it shows a female with "thin legs" and wearing a "black sweatsuit." (Maj. opn. at p. 8.) Whether the female has "thin legs" or not, many millions of people might be described as having "thin legs;" the circumstance of the perpetrator wearing a black sweatsuit does not connect A.S. to the crime in any way. So too with the "distinctive manicure" discerned by the majority, which was never mentioned let alone linked to anything at trial. None of this makes a circumstantial case such that a reasonable fact finder could find A.S. guilty beyond a reasonable doubt.

in the courtroom, but that was only to identify her as being the person who showed up at the police station to ask about her boyfriend, as depicted on the body camera footage of another police officer. Of course, circumstantial evidence may provide substantial evidence of guilt without eyewitness identification, but, here, I do not believe the totality of the evidence was of sufficient "reasonable, credible and of solid value" for a reasonable factfinder to determine A.S. was guilty beyond a reasonable doubt. (*Rodriguez, supra,* 20 Cal.4th at p. 11.)

Because in my view there was insufficient evidence to find A.S. guilty of the carjacking, I need not discuss the firearm. The video of A.S. holding a firearm is not proof beyond a reasonable doubt that she used it in a carjacking (or that she committed the carjacking) about two days after the video was taken.

Our Supreme Court recently wrote in a "close case" where the majority of the court reversed a second degree murder conviction because the evidence was insufficient to support it, " ' "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact." ' " (*People v. Collins, supra*, 17 Cal.5th at pp. 300, 307.)

On this record, I would reverse the judgment in its entirety not because I would not have found A.S. guilty had I been the trial judge but because I conclude the evidence in this case does not permit *any* reasonable trier of fact to find A.S. guilty beyond a reasonable doubt. Because my colleagues reach a contrary conclusion, I respectfully dissent.


Miller, J.


11